[Civ. No. 14399. Fourth Dist., Div. One. Mar. 23, 1977.]

CURTIS W. ALLEN et al., Plaintiffs and Respondents, v.
CALIFORNIA TOLL BRIDGE AUTHORITY et al.,
Defendants and Appellants.

COUNSEL

Harry S. Fenton, Kingsley T. Hoegstedt, John W. Anderson, Scales, Patton, Ellsworth & Corbett and Robert M. McLeod for Defendants and Appellants.

Eugene A. Horton and David R. Thompson for Plaintiffs and Respondents.

OPINION

WHELAN, J.*—California Department of Public Works, Division of Bay Toll Crossings (Department) and City Transit Systems (Company) have separately filed notices of appeal from a judgment signed and entered on May 7, 1974, for the direct payment of money to each of 24 plaintiffs, all of whom are former employees of Company.

The action in which the judgment was rendered was for declaratory relief commenced July 19, 1971.

Department has constructed a bridge across a part of San Diego Bay between the Cities of San Diego and Coronado. Until the bridge was opened to use on August 3, 1969, Company owned and operated a system of ferry boats between the two cities. Prior to Department's authorization to build the bridge, there had been legislation in which the toll bridge authority, now division of bay toll crossings, was directed to reimburse Company for amounts paid by Company to such of its employees as should not, under certain conditions, be employed by the State of California (State) should the bridge be built. The amounts for which all plaintiffs were held entitled to money judgments from both State and Company represented such severance pay to be calculated according to a certain formula.[1]

Department authorized construction of the bridge on November 15, 1966. Necessarily that action had been preceded by preparatory activity in many directions. As early as 1955, there had been State action looking toward the possibility of building such a bridge. In that year the

_____

*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

[1]According to a letter written by counsel for plaintiffs, the amount involved was somewhat in excess of $244,000.

Legislature enacted a statute providing funds for the study of the feasibility of constructing a trans-bay highway either by way of a bridge or tube (Stats. 1955, ch. 1697), interpretation of which, as amended in 1965, is the key problem involved in this appeal. That statute in full, as originally adopted, was as follows:

"An act relating to a toll tube or other toll highway crossing or ferry across the Bay of San Diego from the City of San Diego to the City of Coronado, and making an appropriation therefor.

"[Approved by Governor July 6, 1955. Filed with Secretary of State July 7, 1955.]

"The people of the State of California do enact as follows:

"*Section 1.* The sum of two hundred thousand dollars ($200,000), or so much thereof as may be necessary, is hereby appropriated out of the State Highway Fund for investigation and study of the feasibility of financing through revenue bonds and constructing a toll tube or other toll highway crossing, and for the surveys, plans, estimates of cost, preliminary engineering, and other preliminary expenses in connection with such tube or other crossing across the Bay of San Diego between the City of San Diego and the City of Coronado. Said appropriation shall be available to the California Toll Bridge Authority for expenditure through the Department of Public Works in accordance with the provisions of the California Toll Bridge Authority Act, or in the event a local government agency exists or is formed in San Diego County with power to construct and operate such a crossing through financing through revenue bonds, the California Toll Bridge Authority and such local agency may contract for the expenditure by such local agency of such funds for such purposes. Such contract shall contain such provisions as the California Toll Bridge Authority deems desirable to insure the economical expenditure of such funds for the purposes for which appropriated, and shall provide for repayment to the State Highway Fund of all sums turned over to such agency, together with interest thereon at the rate of 1½ percent per annum, from the first sale of revenue bonds by it, and in any event by July 1, 1958. In the event the work is performed by the California Toll Bridge Authority through the Department of Public Works, said authority shall return said appropriation, or so much thereof as may be used, with like interest, to the State Highway Fund in the State Treasury from the proceeds of the first sale of revenue bonds issued for the

construction of said tube or other crossing under the provisions of the California Toll Bridge Authority Act.

"In the event that no revenue bonds are issued by the California Toll Bridge Authority or any local agency, or if for any other reason said amounts have not been repaid to the State Highway Fund, with interest as specified, as by July 1, 1958, the amounts shall be returned to the State Highway Fund by deductions from amounts required to be expended in the Cities of San Diego and Coronado on major city streets from said funds. Such deductions shall be made in eight (8) equal quarterly installments, four-sevenths (4/7) of each installment to be charged against the funds available for expenditure in the City of San Diego and three-sevenths (3/7) from those available for expenditure in the City of Coronado.

"Sec. 2. If a toll tube or other toll highway crossing described in Section 1 of this act is constructed, and will accommodate a substantial part of the traffic served by a privately owned toll bridge, ferry, tube, or other toll highway crossing, the authority shall authorize and direct the department to acquire such ferry either through mutual agreement with the ferry owners or by the exercise of eminent domain. The authority shall provide in the mutual agreement or in the exercise of eminent domain that the owners of the ferry shall through a process of collective bargaining pay personnel severance pay and the actuarial value of accrued pension rights, and if a ferry so acquired is operated by the authority, the authority shall pay the personnel thereof one month's severance pay for each year of service with the ferry up to 15 years, when the ferry service is discontinued.

"The authority may authorize the department to operate a toll bridge, ferry, tube, or other toll highway which has been acquired, with the personnel theretofore employed thereon, until such time as the authority and the department in their discretion deems it necessary or desirable to discontinue operations, in which event the authority shall authorize and direct the department to discontinue the toll bridge, ferry, tube, or other toll highway and pay the personnel thereof one month's severance pay for each year of service with the ferry up to 15 years.

"In the employment of personnel the department shall, insofar as possible, employ persons displaced from their usual positions with a privately owned toll bridge, ferry, tube, or other highway crossing, because of the operations of the authority and department, and pay said

personnel at least the rates of pay which such persons received in private employment."

The 1965 amendment to that statute (Stats. 1965, ch. 876) is as follows:

"An act to amend Section 2 of, and add Sections 3, 4, 5, and 6 to, Chapter 1697 of the Statutes of 1955, relating to ferries and other toll highway crossings across the Bay of San Diego from the City of San Diego to the City of Coronado.

"[Approved by Governor July 6, 1965. Filed with Secretary of State July 6, 1965.]

"The people of the State of California do enact as follows:

"*Section 1.* Section 2 of Chapter 1697 of the Statutes of 1955 is amended to read:

"Sec. 2. If a toll tube or other toll highway crossing described in Section 1 of this act is constructed, and will accommodate a substantial part of the traffic served by a privately owned toll bridge, ferry, tube, or other toll highway crossing, the authority shall authorize and direct the department to acquire such ferry and its property required for its operations either through mutual agreement with the ferry owners or by the exercise of eminent domain. The authority shall provide in the mutual agreement or in the exercise of eminent domain that the owners of the ferry shall through a process of collective bargaining pay operating, maintenance and toll collection personnel the actuarial value of accrued pension rights and in addition thereto, if such toll bridge, ferry, tube or other toll highway crossing is not to be operated by the authority, shall pay not exceeding one basic month's severance pay for each year of service up to and including 25 years to any of such personnel as are not offered employment by any state agency under the conditions hereinafter set forth in Section 3 of this act. As used in this act, the term 'basic month's severance pay' shall mean the employee's hourly wage at straight time multiplied by 173.3 hours. The authority shall reimburse the owners for the amounts so paid respecting accrued pension rights but not exceeding the amounts which the owners could have been required to pay under any collective bargaining agreement in effect at the time the authority authorizes construction of the toll tube or other toll highway crossing, by applying to all operating, maintenance and toll collection personnel the formula of any collective bargaining

agreement in effect on April 1, 1963. The authority shall also reimburse the owners for the amounts so paid respecting severance pay but not exceeding one basic month's severance pay for each year of service with the toll bridge, ferry, tube or other toll highway crossing up to and including 25 years. In making such reimbursements respecting both accrued pension rights and severance pay, the obligation of the authority shall, notwithstanding any other provision of this act, be limited to making reimbursement for payments made by the owner to personnel who, on the date the authority authorizes construction of the project, are not eligible, under the terms of any retirement plan then in effect, for immediate retirement.

"The authority may authorize the department to operate a toll bridge, ferry, tube, or other toll highway crossing which has been acquired, with the personnel theretofore employed thereon, until such time as the authority and the department in their discretion deem it necessary or desirable to discontinue operations, in which event the authority shall authorize and direct the department to discontinue the toll bridge, ferry, tube, or other toll highway. At the time the authority directs the department to discontinue the operation of the toll bridge, ferry, tube, or other toll highway crossing, it shall also direct the department to pay the personnel engaged in the operating, maintenance and toll collection functions thereof one month's severance pay for each year of service up to and including 25 years.

"Sec. 2. Section 3 is added to said chapter, to read:

"Sec. 3. Severance pay shall not, however, be payable to any such personnel who are offered permanent employment and who become permanent employees of any state agency under the following conditions:

"1. The rate of pay shall be substantially the same as that received at the time operations are discontinued.

"2. The place of employment shall be within a radius of 50 miles of the City of San Diego unless the employee, at his option, accepts employment at a place outside said 50-mile radius.

"3. Any employee who accepts employment with a state agency and whose employment is terminated by said agency prior to the expiration

of his probationary period for any reason which is the fault of said employee shall not be entitled to severance pay.

"Sec. 3. Section 4 is added to said chapter, to read:

"Sec. 4. An employee eligible for retirement under any collective bargaining agreement with the owners of a privately owned toll bridge, ferry, tube, or other highway crossing who accepts such retirement shall not be entitled to severance pay.

"Sec. 4. Section 5 is added to said chapter, to read:

"Sec. 5. In the employment of personnel the department shall, insofar as possible, employ persons displaced from their usual positions with a privately owned toll bridge, ferry, tube, or other highway crossing, because of the operations of the authority and department, and pay said personnel substantially the same rates of pay which such persons received in private employment.

"Sec. 5. Section 6 is added to said chapter, to read:

"Sec. 6. In the event that the authority determines it to be necessary or desirable in connection with the financing of the crossing, it shall authorize and direct the department to acquire by mutual agreement with the ferry owners or by the exercise of eminent domain any passenger ferry operating across the Bay of San Diego which is engaged in the transportation of persons and property other than vehicles. If the authority directs the department to acquire any such passenger ferry, the provisions of this chapter, to the extent applicable, shall apply to such acquisition, provided, however, that no pension rights shall be created by such acquisition, and the provisions of this chapter relating to pension rights shall be applicable only with respect to pension rights in existence prior to May 1, 1965. In addition to the requirements of this chapter relating to eligibility for severance pay, no employee of such passenger ferry company shall be entitled to severance pay unless his employment with such passenger ferry company is necessarily terminated as a result of the acquisition of the passenger ferry company's facilities. Should the department be directed to acquire such passenger ferry, the department shall be required to acquire only such facilities of the passenger ferry company as are used exclusively for the operation of the passenger ferry service across the Bay of San Diego." (Stats. 1965, ch. 876.)

Department acquired the ferry as the result of an agreement with Company, and never operated the ferry.

The focus of the problem is found in the allegations of paragraphs VIII and X of plaintiffs' complaint, which read:

"VIII Defendants . . . interpreted Chapter 1697 as amended, to mean that all ferry personnel had to apply for and accept, if offered, permanent employment on the San Diego-Coronado Bridge, if the rate of pay on the Bridge for a respective ferry employee were substantially the same as the employee received from the ferry owners at the time ferry operations were discontinued; that the respective ferry employee had no right to elect whether he would 'become a permanent employee' on the Bridge or receive severance pay to which he would otherwise be entitled; that failure of a respective ferry employee to accept qualifying employment offered on the Bridge would result in no State job and no severance pay for such ferry employee.

"Plaintiffs contend that the defendants' interpretation of Chapter 1697, as amended, is incorrect; that no ferry employee should have been forced to forfeit his severance pay if he elected not to become a permanent Bridge employee or permanent employee of any other State agency."

" . . . . . . . . . . . . . . . . .

"X Plaintiffs contend that any ferry personnel who elected to receive severance pay in lieu of becoming a permanent employee of the Bridge or any State agency had a right to do so; that further, in light of defendants' inconsistent and arbitrary manner of interpreting and applying the provisions of Chapter 1697, as amended, with respect to severance pay and State jobs, all former ferry personnel should now be paid severance pay to which they would otherwise be entitled, without in any way considering their present, past or future status as employees of any State agency."

There are other collateral and subsidiary problems to be considered. The trial court found the meaning of the statute to be as contended by plaintiffs.

The interpretation placed upon the statute by defendants was expressed by Department's director in a letter of July 14, 1967, addressed to all employees of Company.

That letter was followed by one dated October 24, 1968, from Department to Captain D. E. Bettencourt, Secretary-Business Manager of the Masters, Mates and Pilots.

That interpretation was adhered to by Department, except that it was later concluded the transition from one employer to another should not interrupt employment.

If the 1955 act had not been amended, plaintiffs' theory would find support in section 2 of the original act. In that section, severance pay was to be provided without condition, but was to be limited to one month's pay for each year of service not to exceed 15.

The amendment of 1965 made significant changes: Under the new section 2, severance pay was provided for a maximum of 25 years of service, rather than 15; but payment was to be made only to such personnel of Company who were not offered employment with any State agency under the conditions set forth.

A similar restriction was found in section 6 of the 1965 act, which had to do with the possible acquisition and possible operation by Department of a private passenger ferry. In either of those events: "In addition to the requirements of this chapter relating to eligibility for severance pay, no employee of such passenger ferry company shall be entitled to severance pay unless his employment with such passenger ferry company is necessarily terminated as a result of the acquisition of the passenger ferry company's facilities." (Stats. 1965, ch. 876.)

It is to be inferred from the provisions of section 6 that the private owner of the passenger ferry had other business operations as well.

Apart from their proper interpretation, it is clear that neither the 1955 act nor the 1965 amendment sprang fully panoplied from the legislative brow. Their content suggests the prior existence of concern on the part of employees of Company and their labor representatives, and of Company itself, as to the effects of the building of such a bridge or tube. An evident purpose of the statutes was to prevent the spread of local

opposition to the public construction of a method of trans-bay travel in competition with the existing privately owned ferry system.

Before and during the construction period, employees of Company were represented by one or another of three labor unions, the Inland Boatmen's, the Marine Engineers, and Master, Mates and Pilots. Their respective contracts, in effect when the bridge opened, had been entered into on July 1, 1966, July 8, 1966, and July 3, 1968. Each of the contracts contained certain identical provisions:

Rule 29—Job Protection:

"It is mutually recognized that in the event of a sale of the Ferry Company to a municipality, the employees of the company would have a primary interest in the continuation of their employment under conditions not less favorable than those enjoyed by them at the time of said sale.

"It is further mutually recognized that due to the uncertainty of a sale or of the time, conditions or parties to such a sale, it is not practicable at this time to determine the steps which could be taken to protect employment and working conditions for the employees.

"In order that discussions on this matter may be held at a mutually acceptable time, it is agreed that when any one of the conditions listed below obtains, the company will give the union immediate notice and will, upon receipt of written request from the union, consent to a review of ways and means of providing continued employment under conditions not less favorable in the whole than those enjoyed by the employees at the time of such sale:

"1. Formal negotiations are opened with a municipality for sale of the Ferry Company.

"2. Legal notice is published of an election by a municipality to authorize the purchase of the Ferry Company or the issuance of bonds to finance such purchase.

"3. Formal discussions are opened with other ferry unions on the subject.

"When notice of such a review is served by the union, the company will enter into negotiations with the union within ten (10) days, and failing to arrive at a satisfactory settlement of the issues involved within thirty (30) days, either party may submit the issues in dispute to arbitration."

Rule 30—Accrued Pension and Severance Benefits:

"If a toll tube or other toll highway crossing described in Section 1 of Chapter 1697 of the California Statutes of 1955 is constructed, and will accommodate a substantial part of the traffic served by the Ferry Company, and if the Ferry Company ferries are not to be operated by the Authority, then the following provisions respecting severance pay shall be in effect:

"1. The Ferry Company shall pay its employees who are not offered employment by any state agency under the conditions set forth in Section 3 of Chapter 1697 of the California Statutes of 1955 after service is discontinued by the Ferry Company one basic month's (173.3 hours) severance pay for each continuous year of service with the Ferry Company up to and including 25 years, provided, however, that an employee eligible for retirement under the collective bargaining agreement then in effect between Ferry Company and Union, who retires shall not be entitled to severance pay.

"2. The total years of service shall be computed to the closest whole month as in paragraph I-4(b) in the case of pensions.

"3. All such payments required to be paid by the Company by this agreement, and by applicable State Law, shall be paid within 90 days after the date ferry service is discontinued by the Company.

"4. This Rule 30 supersedes and replaces the Supplemental Agreement which became effective July 1, 1957 between the parties hereto."

Rule 32—Job Protection:

"The company agrees that in the event of the acquisition of the Ferry System by any agency of the State of California, either by sale or the exercise of eminent domain, and the continued operation of the ferry boats by the company under contract with the State, the company, to the extent permitted by law, will continue to recognize the union as the representative of the licensed deck personnel, and will continue to

recognize this Agreement until its termination date or until the company ceases its operation of the ferry boats, whichever date is the first to occur.

"It is further agreed that during continued operation by the company after sale to a State Agency, if a reduction in force is made which is not directly connected with the abandonment or partial abandonment of service, the classification of any employee which is adversely affected shall not be reduced below that held by him on the date of the sale for purposes of computing severance pay."

There was an amendment, dated August 7, 1968, to the contract of the Masters and to that of the Engineers, providing for an increase of hourly pay on January 1, 1969, which had not been provided for in the 1966 agreements. The amendment on behalf of the Masters was signed by W. H. Vermeulen as president. The Inland Boatmen's contract, dated July 3, 1968, seems to have been revamped at that time to contain a similar provision.

None of the union representatives in the execution of the 1966 contracts testified as a witness at the trial.

It is clear that the main concern of the bargaining agents of the members of the three unions was the continued employment of those members.

A correct interpretation of the legislative intent should take into consideration the collective bargaining agreements between Company and its operating employees, which are referred to in the act.

It is clear from the language of each of the three latest agreements, that in 1957 the then existing agreements were supplemented by a provision dealing with the contingency of State acquisition and its effect upon job protection. The supplement itself is not before us; it may have taken much the same form as Rule 29 in the latest agreements, which we have quoted.

If there were to be a provision in the collective bargaining agreement for severance benefits, Company would desire to shift to State the ultimate burden caused by the payment of such benefits. Such a shift of burden perhaps could not, without legislative authority, enter into the damages in a condemnation action at that time. The provision for such assumption by State of the ultimate burden was without question a part

of the preliminaries to the agreement entered into between Department and Company for acquisition of the ferry system.

The legislation had as another evident purpose the authorization to provide such consideration for agreement between Department and Company, rather than to make a grant to the individual employees of Company for their past service with Company.

All the plaintiffs in this action, except Curtis W. Allen and Lester J. Miller, were offered and accepted permanent employment with the bridge on or about August 3, 1969, the time of its opening, at higher rates of pay than they had been receiving at Company, and all plaintiffs satisfactorily completed their probationary period.

A determination that the word "substantially," as used in the statute, would mean "within 5 percent" had been agreed upon between the unions representing Company's operating employees, Company and State. Its reasonableness is not challenged.

In the fall of 1968, Department realized that minimum pay rates for the positions which would be offered displaced Company employees were substantially less than the employees were making at Company. Department, in the belief it was authorized by Government Code section 18859, made arrangements with the State Personnel Board to hire, insofar as it could be done within the rules, at rates of pay higher than the lowest step. A letter, dated October 11, 1968, was sent from Department to D. E. Bettencourt, informing him that "salaries to be paid toll collectors who are presently employees of the Ferry Company will be based on their present salary with the Ferry Company, not on their rank or rate . . . ."

The letter advised the unions that "employees making over $660 will be offered $660. All others will be offered the step in the range closest to the salary being received at the time the employee starts to work for the State. No employees will be offered less in salary than they are receiving except those over the $660." Where both the higher and the lower of two salary steps were within 5 percent of an employee's salary in between them, he was hired at the higher step.

That was done to meet the Legislature's direction in section 5 of the statute that such employees, "insofar as possible" should receive substantially the same rate of pay they were receiving at Company.[2]

The union officials advised the employees to make applications for jobs, that an employee could not get both severance pay and a job, and were otherwise involved in the negotiations as to who would and who would not be entitled to severance pay. None of those union officials testified at the trial. Miller testified that he and Johnston, a plaintiff who did not testify, were each one of two representatives of their respective unions in one meeting held by union representatives, Company representatives, and State representatives. Miller did not testify to any interpretation by the unions different from that of Department.

On June 3, 1969, a letter to plaintiff Carl Holloway advised him that a Company employee, if he did not obtain State employment under the prescribed conditions and therefore was paid severance, might conceivably later obtain State employment without surrendering severance pay already received.

As a witness Holloway testified that as early as 1965 there were conversations among the employees of Company as to what the requirements of the statute were in order to qualify for severance pay, and that he wanted to "do a little testing of the law right then but he had no money."

In the intervening time, the unions, under Bettencourt, entered into negotiations with State to seek some pro rata partial severance and permanent employment for those employees of Company whose pay at the time of discontinuance would be so high that State could not find positions for them at a rate of pay within 5 percent of their Company pay. Those negotiations were undertaken in the belief that under the language of the statute displaced employees of Company receiving severance pay might receive not exceeding one basic month's severance pay for each year of service.

Positions were not available for Allen and Miller at substantially the same rates of pay as they were receiving at Company. Each negotiated to receive employment at a lower salary and pro rata partial severance pay

---

[2]It was on September 29, 1969, that the State Personnel Board, in writing, approved Department's request for hiring above the minimum salary step for toll collectors.

in an amount agreed upon ($3,079.50). They were then paid such pro rata partial severance pay by Company, became so employed by Department, and endorsed and cashed the Company checks which contained the following restrictive endorsement: "Endorsement, deposit or transfer of this check or warrant constitutes payment in full for, release of, and accord and satisfaction for, all claims and demands of the payee for severance pay against City Transit Systems, the San Diego and Coronado Ferry Company, and the State of California, and officers, agents and employees in connection with any agreement or contract or in connection with Chapter 1697 of the California Statutes of 1955 as amended by Chapter 876 of California Statutes of 1965, or otherwise."

Both checks were dated August 6, 1969. Miller's check was cashed on August 18; Allen's on November 12.

Only 10 of 24 plaintiffs testified at trial. Allen testified he "may have offered to accept the partial severance"; that he was told "in negotiations" that if he took the job at the lower rate of pay he would get the partial severance; that he brought up the question of "partial severance pay"; that he agreed to forfeit full severance in order to get a job; that he was not required to take the job; that he knew what he was doing when he signed the check with the restrictive endorsement; and that he never requested a job and full severance. As early as August 25, 1967, he had written to Department inquiring if he would be permitted to accept a position which would offer a salary less than he was then receiving from Company.

Miller testified that the union had worked out the pro rata partial severance pay agreement, that he would have been willing to waive like pay to get a job with seniority; that he realized when he signed the check that he was waiving any further right to severance pay; that he was told through "our representatives" if he accepted his full severance pay he would not also have a job; he first heard of "partial severance" from Bettencourt; he signed the endorsement on the check because if he had not he would not have gotten his partial severance pay.

F. J. Richardson testified that even at the time of trial he did not know if he would take severance instead of a job.

Holloway testified he "appreciated" starting at $700 at the bridge, considerably in excess of the $543 he had been receiving at Company and that "I really wanted a job."

John D. Davis, who obtained a position as toll collector, testified "personally I would rather work."

C. W. Steeples testified he "definitely" wanted the job of toll collector, which he obtained; that he would have been willing to take a cut in pay; that he "naturally" wanted the highest rate possible starting out with State; and that he "gladly" gave up $9,700 for the job.

E. Tyndal, when asked, "Would you rather have taken $4,700 than a job?" testified, "How would I have supported my family?"

There was no testimony from any plaintiff testifying that had he been given the option of refusing State employment and receiving full severance pay, he would have accepted the severance pay rather than the employment.

Pro rata partial severance pay and a job at a lower rate of pay had been suggested to W. H. Vermeulen (not a plaintiff). He testified there was no pressure to take pro rata partial severance pay, and he refused it. Vermeulen was, therefore, paid his full severance pay on August 7, 1969. N. Lindell said he had a like experience. On June 14, 1971, Vermeulen was offered, and accepted, a position as a toll collector on the bridge.

Former employees of Company who were not plaintiffs testified variously as follows:

Each of three testified State could not offer him a job at substantially the same rate of pay he was receiving at Company, and he therefore did not apply for a job and was paid full severance on August 7, 1969.

William Kitzmann received his full severance pay on August 7, 1969, at which time he was making $560 per month at Company. In November 1969, Kitzmann obtained employment with San Diego State College at $455 per month.

J. P. Morrison testified he obtained a job at State College, starting on August 14, 1969, at $457 per month, less by more than $100 and by more than 5 percent than he had been making at Company, after he had received his severance pay on August 7, 1969.

C. L. Lyons testified he received his full severance pay in September 1969 and that, on November 1, 1969, he obtained a position with State at $550 per month.

D. M. Lewis testified he would have been willing to "throw out" the 50-mile limitation in order to get a job.

At time of trial, which commenced November 1, 1973, 22 of the 24 plaintiffs were still permanent employees of State. M. I. Johnston had resigned from State in March 1972, and J. C. Eggers had resigned in January 1972.

At the time of trial, the 24 plaintiffs had been paid, in salary, a total of $896,490.87 by State.

State reimbursed Company for $958,949.21 paid on August 7, 1969 and August 28, 1969, to 110 Company employees to whom State was not able to offer permanent employment at rates substantially the same as they were receiving at Company. Of those men, 20 had applied for employment with State and were on waiting lists for such employment; those 20 had received $172,422.71 of the total severance benefits paid.

In August 1969 all the positions with State had been filled by others, including the 24 plaintiffs.

After all available State positions, meeting the conditions of the statute, had been filled, those Company employees who had not been offered employment and were otherwise entitled to severance pay received it.

When Company employees sufficient in numbers had qualified to fill all the available positions with State, some of those who had not yet applied were not required to do so as a prerequisite to receiving severance pay, since they could not have been offered State employment when the ferry operation ceased.

Department's attorney, on April 10, 1970, wrote to Company disposing of three pending claims, stating: "This appears to conclude our dealings with regard to this long and rather complicated matter."

Among other findings the trial court found that in order to bring ferry employees who were hired on the bridge within the 5-percent rule, the Department adopted a policy of starting ferry employees hired on the bridge at pay steps closest to their ferry pay rather than the Civil Service beginning pay step for a respective job; that the effect of such policy was to have new bridge employees, such as toll collectors, who were doing the same work receive different starting pay; that the policy of hiring such employees for bridge jobs at various pay steps above the beginning pay step was not for any of the reasons specified and allowed by section 18859 of the Government Code, and the approval of the Director of Finance was not obtained; said policy was adopted to avoid the necessity of paying severance pay to new bridge employees who would have been entitled to such severance pay if permitted to accept bridge employment at the Civil Service beginning pay scale for their respective bridge jobs; that employees hired on the bridge were not given the option to start at the beginning pay steps for their respective jobs, and thereby to qualify for severance pay; all such employees who were offered bridge jobs were required to accept such jobs at the pay step closest to their ferry pay or lose both job and severance pay; that ferry employees who were thus required to accept bridge jobs at above the beginning step were later denied the customary periodic pay raise to which they were entitled under Civil Service rules and procedures; that although Department announced as stated policy and statutory interpretation that all ferry employees had to apply for and accept, if offered, employment with the State under the conditions heretofore found to be true, certain ferry personnel did not apply for any State jobs and received severance pay; other ferry personnel made only token, ineffective, or wholly disinterested State job applications and were paid severance pay; that certain selected ferry employees were offered employment and hired on the bridge and given partial severance pay; certain other ferry employees in the same pay brackets were not given the same offer and certain other personnel were told there was no legal way for the State to negotiate with them in terms of offering a job and severance pay; that all of the foregoing policies and practices, and the administration, interpretation, and application of the provisions of said statute by Department were and each was inconsistent, erroneous, arbitrary, and capricious; such administration, interpretation and application were acquiesced and concurred in by Company; that Allen and Miller are entitled to their full severance pay without regard to any purported waivers or releases they may have signed; that any such purported waivers or releases were not free and voluntary, were signed by mistake of fact and law, were without consideration, and exceed the authority of the statute; defendants may

not properly assert the validity of any such purported releases or waivers; that in equity, plaintiffs are entitled to look to both Department and Company for payment of severance pay monies to be paid plaintiffs in this cause; that the primary obligation to fund and pay severance pay is that of Department and Company is entitled to full reimbursement from Department for all severance pay monies paid to plaintiffs in this cause by Company.

The trial court concluded that the statute as amended did not require ferry personnel to apply for and accept, if offered, employment on the bridge or any other State agency as a condition of receiving severance pay to which such personnel were otherwise entitled under the said statute; that it was the right or option of ferry personnel to refuse or reject offered employment on the bridge or any other State agency and receive severance pay as allowed by the provisions of the statute; that neither Department nor Company had the right to impose the condition that ferry personnel apply for and accept, if offered, employment on the bridge or other State agency or lose both job and severance pay; that any present employee of the bridge may now elect, but is not required, to terminate his employment and receive the full severance pay to which he is entitled under the severance pay provisions of the statute; that no termination of employment by reason of such election shall be effective until the employee involved receives his severance pay; that J. C. Eggers and Marion I. Johnston, are entitled to receive their full severance pay; that for purposes of determining eligibility for severance pay, the Department improperly hired certain former ferry personnel for jobs on the bridge at starting rates of pay higher than the Civil Service beginning rate of pay for the respective jobs; that all such personnel should have been employed at the beginning Civil Service pay step for their respective jobs, rather than at higher pay steps, and all hirings of ferry personnel in excess of the minimum beginning Civil Service pay step for the respective jobs were not in conformance with law; that any plaintiffs who are presently employed on the bridge and who do not elect to terminate their employment and receive full severance pay shall be deemed to have begun work on the bridge at the Civil Service beginning pay step for their respective jobs and to have received periodic raises thereafter in accordance with Civil Service regulations and procedures; and shall receive their full severance pay, subject to adjustment or deduction for salary previously paid in excess of the beginning pay step and Civil Service successive increased pay steps for the respective bridge job; except for Allen and Miller; that the statute does not provide for partial severance pay, and Allen and Miller are entitled to their full

severance pay, subject to adjustment or deduction for partial severance pay previously paid and for salary previously paid in excess of the minimum or beginning pay step for their respective jobs and periodic Civil Service successive pay increases for such jobs; that any purported waivers or releases signed by Allen and Miller are invalid and of no effect.

■■■ We find the interpretation placed upon the legislation by Department to be reasonable. The evident purpose of the statute as to employment and severance pay was to furnish employment where possible; and to have severance allowances paid where employment could not be given. Severance pay is only a solatium for loss of employment. In any rational system of values, as in Aristotelian ethics, employment has a higher value than the substitute therefor.

The intent of the Legislature in the 1965 amendment can be more readily perceived by contrasting its section 2 with the unamended section. It is almost inescapable that there would be no reimbursement for severance benefits paid to employees who were offered State employment under the conditions expressed in section 3 of the 1965 act.

The contemporaneous interpretation by Department, not unreasonable in itself, acquiesced in at the time by Company, the union representatives of the employees, and the employees themselves, also is entitled to some weight.

■■■ It is the duty of the court, where the prior administrative construction is contrary to, and not justified by, the statutory law, to disregard such prior administrative construction and to state the true meaning of the statutes, even though this requires the overthrow of earlier administrative constructions. (*Douglas Aircraft Co.* v. *California Unemp. Ins. Appeals Board,* 180 Cal.App.2d 636, 642 [4 Cal.Rptr. 723].) Nevertheless, where there is administrative interpretation of a statute, such interpretation will be accorded great respect by the courts and will be followed if not clearly erroneous. (*Noroian* v. *Department of Administration,* 11 Cal.App.3d 651, 655 [89 Cal.Rptr. 889]; *Coca-Cola Co.* v. *State Bd. of Equalization,* 25 Cal.2d 918, 921 [156 P.2d 1]; *Richfield Oil Corp.* v. *Crawford,* 39 Cal.2d 729, 736 [249 P.2d 600]; *County of Los Angeles* v. *Frisbie,* 19 Cal.2d 634, 643 [122 P.2d 526]; *La Rue* v. *Board of Trustees,* 40 Cal.App.2d 287, 295 [104 P.2d 689]; *Meyer* v. *Board of Trustees,* 195 Cal.App.2d 420, 431-432 [15 Cal.Rptr. 717].)

" '(C)ontemporaneous and practical construction of a statute by those whose duty it is to carry it into effect, plus acquiescence by persons having an interest in the matter, is sufficient to justify the court in resolving any doubt as to the meaning of the language employed . . . in favor of such long unquestioned interpretation.' (*Prichard* v. *Southern Pac. Co.,* 9 Cal.App.2d 704, 706 [51 P.2d 428]; see also *People* v. *Southern Pac. Co.,* 209 Cal. 578 [290 P. 25].)

" . . . . . . . . . . . . . . . . .

"Of course, such guides are not conclusive, and a clearly erroneous administrative construction will not govern interpretation by the court." (*Cal. M. Express* v. *St. Bd. of Equalization,* 133 Cal.App.2d 237, 240 [283 P.2d 1063].)

"[W]ith particular reference to the administration of civil service, it is the policy of the courts of this state that 'Courts should let administrative boards and officers work out their problems with as little judicial interference as possible. . . . Such boards are vested with a high discretion and its abuse must appear very clearly before the courts will interfere.' " (*Nelson* v. *Dean,* 27 Cal.2d 873, 881 [168 P.2d 16, 168 A.L.R. 467].)

█ From the beginning of discussions, it must have been obvious that all the operating personnel of Company, no matter how well qualified, could not be employed on the bridge when it was constructed. That constituted a problem caused by the legislative directive in section 5 of the 1965 act. The charges now made of administrative arbitrariness and inconsistency would have had a sure foundation if Department had offered only to selected employees the opportunity to make application for employment under the Civil Service regulations. The procedure adopted that all who wished to qualify for employment, or, alternatively, to receive severance pay, should apply for employment, was under the circumstances fair and reasonable.

█ Plaintiffs had a direct contractual relationship with Company and their rights to severance pay depended on the contract giving rise to those rights. Department had no preexisting obligation to plaintiffs. The ultimate burden of reimbursing Company could be justified only as being a part of consideration moving to Company in the acquisition of the ferry system by Department.

The statute fixed the terms under which reimbursement would be made; and the collective bargaining agreements adopted those conditions in its severance pay provisions. The activity of Department in its dealings with Company's personnel may be seen as made to secure the performance of the statutory conditions. Such activity could not in any way enlarge the provisions of the statute.

While estoppel may sometimes be urged against State (see *City of Long Beach* v. *Mansell*, 3 Cal.3d 462 [91 Cal.Rptr. 23, 476 P.2d 423]; *Crumpler* v. *Board of Administration*, 32 Cal.App.3d 567 [108 Cal.Rptr. 293]), plaintiffs have not relied upon any theory of estoppel, nor did the trial court rely upon such a theory.

The activity of Department did not give rise to any direct obligation to Company personnel under the statute.

In *Whitcomb Hotel, Inc.* v. *Cal. Emp. Com.*, 24 Cal.2d 753, 755, 757-758 [151 P.2d 233, 155 A.L.R. 405], the court said:

"The sole issue on the merits of the case involves the validity of Rule 56.1, which limits to a specific period the disqualification imposed by section 56(b) of the act. Section 56 of the act, under which the claimants herein were admittedly disqualified, provides that: 'An individual is not eligible for benefits for unemployment, and no such benefit shall be payable to him under any of the following conditions: . . . (b) If without good cause he has refused to accept suitable employment when offered to him, or failed to apply for suitable employment when notified by the District Public Employment Office.' Rule 56.1, as adopted by the commission and in effect at the time here in question, restated the statute and in addition provided that: 'In pursuance of its authority to promulgate rules and regulations for the administration of the Act, the Commission hereby provides that an individual shall be disqualified from receiving benefits if it finds that he has failed or refused, without good cause, either to apply for available, suitable work when so directed by a public employment office of the Department of Employment or to accept suitable work when offered by any employing unit or by any public employment office of said Department. Such disqualification shall continue for the week in which such failure or refusal occurred, and for not more than three weeks which immediately follow such week as determined by the Commission according to the circumstances in each

case.' The validity of this rule depends upon whether the commission was empowered to adopt it, and if so, whether the rule is reasonable.

". . . . . . . . . . . . . . . . . . .

"The construction of a statute by the officials charged with its administration must be given great weight, for their 'substantially contemporaneous expressions of opinion are highly relevant and material evidence of the probable general understanding of the times and of the opinions of men who probably were active in the drafting of the statute.' . . . Whatever the force of administrative construction, however, final responsibility for the interpretation of the law rests with the courts. 'At most administrative practice is a weight in the scale, to be considered but not to be inevitably followed. . . . While we are of course bound to weigh seriously such rulings, they are never conclusive.' [Citation.] An administrative officer may not make a rule or regulation that alters or enlarges the terms of a legislative enactment. . . .

". . . . . . . . . . . . . . . . . . .

"The disqualification imposed upon a claimant who without good cause 'has refused to accept suitable employment when offered to him, or failed to apply for suitable employment when notified by the district public employment office' is an absolute disqualification that necessarily extends throughout the period of his unemployment entailed by his refusal to accept suitable employment, and is terminated only by his subsequent employment. [Citations.] The Unemployment Insurance Act was expressly intended to establish a system of unemployment insurance to provide benefits for 'persons unemployed through no fault of their own, and to reduce involuntary unemployment. . . .' "

Department dealt directly with Company's employees and their union agents as to Department's interpretation of what was required by Department before it would acknowledge an obligation to reimburse Company for severance pay allowed by Company. Indeed, it may have appeared that it was Department that was primarily responsible for payment to the employees of the severance compensation.

If that were so, it nevertheless did not give rise to any right of action by the employees against Department to recover such compensation. The statute of 1955 as amended in 1965 did not, under any conditions, other than that of ferry operation by Department, authorize or direct the

payment by Department of severance pay to the employees. It authorizes, directs and promises only that Department will reimburse Company for severance pay allowances made under Company's collective bargaining agreement and subject to the limitations contained in the act. Since State, by the statute, was obligating itself financially, the statute should be construed strictly in its favor (*Westinghouse Electric Co.* v. *Chambers,* 169 Cal. 131 [145 P. 1025]).

Since the collective bargaining agreements referred to the provisions of section 3 of that statute as governing the conditions under which severance payment would be made, it is understandable that Department's officials should have given to the employees, when asked, Department's interpretation of the statute as to the situations in which Department would hold that severance pay should not have been made.

Plaintiffs have not claimed that such activity by Department's officials, even to the point of dealing with the individual employees, gave rise to any estoppel against State to deny that the statute provided for direct benefits to be made by State to Company's employees.

If, indeed, Department had interpreted the statute to authorize direct payments to employees, it would have been manifest error. ■ An administrative officer may not make a rule or regulation that alters or enlarges the terms of a legislative enactment (*Whitcomb Hotel, Inc.* v. *Cal. Emp. Com., supra,* 24 Cal.2d 753, 757).

■ We hold there is no cause of action against State based on the statute for severance pay; accordingly, Code of Civil Procedure section 338, subdivision 1, does not apply to such purported cause of action. If plaintiffs have a cause of action to recover severance pay, it can only be against Company under the written contracts. To such a cause of action a four-year statute applies.

■ There was nothing in plaintiffs' complaint to suggest that a part of the relief afforded by the judgment would be retroactive readjustment of the Civil Service salaries of plaintiffs. For that reason Department, which did urge a defense based upon limitations, was not at fault for not having pleaded specifically Government Code section 19630, which reads: "No action or proceeding shall be brought by any person having or claiming to have a cause of action or complaint or ground for issuance of any complaint or legal remedy for wrongs or grievances based on or related to any civil service law in this State or the administration thereof

unless such action or proceeding is commenced and served within one year after such cause of action or complaint or ground for issuance of any writ or legal remedy first arose. Such a person shall not be compensated for the time subsequent to the date when such cause or ground arose unless such action or proceeding is filed and served within 90 days after such cause or ground arose. Where an appeal is taken from a decision of the board the cause of action does not arise until the final decision of the board." For that reason alone, it was error for the trial court to make such adjustments.

The Government Code and the Administrative Code, title 2, contemplate administrative review of employee grievances, including those about salary and promotion (see Cal. Admin. Code, tit. 2, §§ 102, 102.5, 540, 540.1, 540.2, 540.3, 540.5, 540.6; Gov. Code, §§ 18714, 18701).

No such administrative review was had or asked for by plaintiffs. For that reason Government Code section 19631, providing for the tolling of the one-year limitation imposed by section 19630, is inapplicable.

Further, the failure of plaintiffs to seek any administrative remedy *prior* to the commencement of any action makes the attempt of the court to make retroactive Civil Service pay adjustments beyond its jurisdiction. Department alleged as one of its defenses that the court lacked jurisdiction of the subject matter; and alleges also that the complaint failed to state a cause of action.

There is a remedy for salary adjustments nunc pro tunc when error has been made that affects retirement rights. But that remedy under Government Code section 20180 is an administrative one in the first instance.

The fact that plaintiffs were not given raises at the end of six months was not in fact the denial of a right. The raise at the end of six months is under section 102.6 of title 2 of the Administrative Code, which reads:

"If the appointing authority certifies in the manner prescribed by the executive officer that the employee has met the standards of efficiency required for his position, the employee who is paid at the minimum step of the salary range in a class designated by the board may receive a special in-grade salary adjustment to the second step of the salary range

effective on the first of the monthly pay period next following completion of:

"(a) six months of qualifying service after his appointment; or

"(b) as otherwise may be provided by board resolution. When movement between classes to the minimum step results in a salary increase of less than one step, the board resolution shall provide that the months of qualifying service be proportionately reduced from 6 to the number of months of qualifying service that will permit the employee to receive approximately the same annual salary he would have received upon appointment to the minimum step with a one-step increase."

The only arbitrariness, therefore, if any existed, was in not starting plaintiffs at the minimum step.

There was discussion during trial whether plaintiffs and other employees of Company were "offered" State employment, or were required to ask for it, and whether such employment was permanent. They were required, indeed, as a necessary preliminary to State employment, to fill out applications and take an examination. Presumably, however, the statute under scrutiny used the words "offered permanent employment" in the sense in which they are used in the Government Code (§§ 18525, 18528):

Section 18525: " 'Appointment' means the offer to and acceptance by a person of a position in the State civil service in accordance with this part."

Section 18528: " 'Permanent employee' means an employee who has permanent status. 'Permanent status' means the status of an employee who is lawfully retained in his position after the completion of the probationary period provided in this part and by board rule."

None of these subsequent facts has a real bearing on the correct interpretation of the legislation: that Allen and Miller could not be offered jobs at a rate roughly equivalent to their current pay with Company, and were willing to take employment at a lower rate along with a cash amount referred to as partial severance pay; that some employees of Company who drew pay higher than that of toll collectors were given State employment as toll collectors at salaries higher than those who had had jobs as toll collectors with Company; that men

employed by State were not given automatic pay increases after six months; that an employee, Antoine Nadeau, who did not apply for State employment and sued State, was paid an amount by Department equal to severance pay calculated upon his salary and length of service.

■ There is no provision in the statute for what has been referred to as "partial severance pay." If its reimbursement to Company by Department was illegal, the question here is not whether Department, in reimbursing to Company the amounts paid to Allen and Miller, was making an unauthorized payment, but whether the two men, who desired employment with Department, could waive a known right to receive full severance pay under the union contract in consideration of the offer of employment by Department and the payment by Company of an agreed sum. The court found they were not bound by their written declaration of such a waiver because of lack of consideration and a mistake of fact and law, but without stating what those mistakes were. The mistake of fact may have been the after-occurring fact that Vermeulen and a few others, whose situations had been similar to those of Allen and Miller, had in 1971 obtained employment with Department. There was no testimony of any preexisting or currently existing fact as to which the two men had been mistaken. The finding was unsupported.

The mistake of law under which Allen and Miller were found to have signed the waivers might have been the belief that if they took the full severance pay to which they knew themselves to be entitled they would have been out of employment with Company; and they would not be employed by Department at substantially the same pay. That was not a mistake, but was a true interpretation of the legal situation.

There is no evidence to support the finding their signing of the waiver endorsement lacked consideration and was not free and voluntary. Allen, indeed, seems to have suspended decision for three months after receiving the check.

There was not an accord and satisfaction, but there was an effective waiver of any right to full severance pay supported by a valuable consideration.

Nadeau, an employee of Company at the time the ferry operations terminated, had been offered a job by Department, but did not accept because of his age (63 years), his feeling he could not do a good job, and other reasons. He did not receive severance pay at the time. On July 18,

1972, he filed a superior court action in declaratory relief against only State. Its allegations were substantially the same as those in the action at bench. A demurrer was filed on September 5, 1972, and overruled on October 5. There were no further proceedings in the superior court action, which, so far as that record is concerned, is still pending.

Nadeau testified that he received a check from Department which is dated January 15, 1973, for the amount of severance pay, which was after Department's letter of April 10, 1970, to Company. The salary in the job Nadeau was offered by Department was less than his salary with Company; was within 5 percent of his regular salary; not within 5 percent of what he actually earned, including overtime.

The handling of that litigation and the payment made to Nadeau are irrelevant to the issues in the present case; they are not res judicata as to any of those issues, and throw no light on the interpretation placed upon the statute at the time the bridge was opened, or upon the correct interpretation of it. Nor did Nadeau's case influence any of the actions of plaintiffs herein.

The cases of Walter H. Vermeulen and of three other former employees of Company who were not offered jobs within 5 percent of their salaries with Company, received full severance pay, and were hired by Department in 1971, are likewise irrelevant to the issues in the present case and are not examples of arbitrary administration of the statute. Department did not say, before the bridge was opened, that refusal of offered employment at the significant time would forever bar a Company employee from future State employment. Such a statement would, indeed, have been unfounded and arbitrary.

Of those men, only Vermeulen testified. Nothing in his testimony suggests he was favored over plaintiffs. If he were unemployed during the almost two years intervening, and nothing in his testimony suggests he was not, he had received the rough equivalent of two years' pay with Company as severance; meanwhile, plaintiffs were acquiring seniority, annuity and pension rights in their State employment. So far as the evidence shows, the other three also may have been unemployed in the year and more between receiving their severance pay and being hired on the bridge.

To the extent Department may have gone beyond the authorization of the statute in making adjustments with other Company personnel after

plaintiffs accepted offered employment, such action by Department cannot have the result of enlarging permissible action under the statute or confer any rights on plaintiffs.

The trial court held as a matter of law that the language of the statute that Company employees be paid, as far as possible, substantially the same rates of pay as at Company, did not create "a problem of recruitment" under Government Code section 18859. That is so if the only problem of recruitment could arise from a shortage of persons available for employment; but that cannot be so. Here, it seems to have been assumed that a difficulty of recruitment and a problem of recruitment are mutually interchangeable phrases. It is our opinion that terms of potential employment equally with a lack of persons available for employment may constitute a problem of recruitment, and that the demands of the 1955 statute as amended posed such a problem.

The judgment is reversed with instructions to the trial court to enter judgment for the defendants.

Ault, Acting P. J., and Cologne, J., concurred.

A petition for a rehearing was denied April 14, 1977.