[L.A. No. 31407. Jan. 18, 1982.]

CITY OF TORRANCE, Plaintiff and Appellant, v.
TRANSITIONAL LIVING CENTERS FOR LOS ANGELES, INC.,
Defendant and Respondent.

COUNSEL

Stanley E. Remelmeyer, City Attorney, and William G. Quale, Deputy City Attorney, for Plaintiff and Appellant.

Quan, Cohen, Kurahashi, Hsieh & Scholtz, Kenneth P. Scholtz and John E. McDermott for Defendant and Respondent.

Erich P. Wise, James Preis, Mary S. Burdick and Dan Stormer as Amici Curiae on behalf of Defendant and Respondent.

OPINION

**RICHARDSON, J.**—This case involves the interaction of a municipal zoning ordinance and section 5120 of the Welfare and Institutions Code which favors local care and treatment of mental patients. In its complaint for declaratory and injunctive relief, the City of Torrance (City) seeks to prevent Transitional Living Centers for Los Angeles (TLC), a nonprofit corporation, from maintaining a facility for mental patients in an area classified as an R-2 zone. City appeals from a trial court order dissolving a temporary restraining order and denying a preliminary injunction. We affirm the trial court's ruling.

In December 1971 City granted to the owners of property at 18312 Mansel Avenue in City a conditional use permit which authorized the operation of a board and care home for the aged. Thereafter, in June 1979, TLC entered into a contract with the County of Los Angeles for the furnishing of transitional community-based residential and rehabilitative services for mentally disordered persons. In furtherance of its contract obligations TLC leased the Mansel Avenue property for a fa-

cility serving 16 such handicapped persons. The contract committed TLC to "provide suitable care and rehabilitation in the least restrictive settings to persons no longer requiring hospitalization related to their mental disability, to improve their functional capacity, ... [and] to provide ongoing support ...."

In August 1979, TLC filed with City an application for a "free license" to operate a "Social Rehabilitation Residential Facility" on Mansel Avenue. Simultaneously, TLC sought and ultimately obtained from the California Department of Social Services a permit to operate on the site a social rehabilitation facility to serve 16 mentally disordered adults, which number was subsequently reduced to 15.

City thereupon filed its action seeking injunctive and declaratory relief, and claiming that TLC had violated City's zoning laws. The gravamen of City's complaint was that the proposed facility was not authorized by local or state law or by the preexisting conditional use permit issued by City to the owners and that the planned use of the property would constitute a public nuisance. City sought the injunction against TLC's planned use of the premises and general declaratory relief establishing the statutory authority for City's zoning restrictions on homes of the type contemplated by TLC. (Welf. & Inst. Code, §§ 5115, 5116, 5120; Health & Saf. Code, div. 2, ch. 3.)

After a hearing, the trial court dissolved a temporary restraining order previously issued and denied the preliminary injunction. City appeals.

In considering the central issue in the case, we reaffirm the rule that the grant or denial of a preliminary injunction lies within the sound discretion of the trial court and we do not disturb its decision in the absence of a showing that such discretion has been abused. (*Continental Baking Co.* v. *Katz* (1968) 68 Cal.2d 512, 527-528 [67 Cal.Rptr. 761, 439 P.2d 889].)

I. *Section 5120*

Our inquiry is directed first at section 5120 which was enacted in 1971 and amended in 1972. The section reads, in its entirety, as follows: "It is the policy of this state ... that the care and treatment of mental patients be provided in the local community. In order to achieve uniform statewide implementation of the policies of this act, it is neces-

sary to establish the statewide policy that, *notwithstanding any other provision of law, no city or county shall discriminate in the enactment, enforcement, or administration of any zoning laws, ordinances, or rules and regulations between* the use of property for the treatment of general hospital *or nursing home* patients *and the use of property* for the psychiatric care and treatment of patients, both inpatient and outpatient. [¶] *Health facilities for* inpatient and outpatient psychiatric care and treatment shall be permitted in any area zoned for hospitals *or nursing homes, or in which hospitals and nursing homes are permitted by conditional use permit.*" (Amended language in italics.)

It will readily be seen that section 5120 establishes a strong statewide policy favoring local community treatment of mental patients as opposed to distant, regional, or institutional care. The section prohibits local discrimination against such treatment and authorizes local psychiatric care and treatment facilities in those areas where hospitals or nursing homes are permitted either by zoning ordinances or conditional use permits.

Against the foregoing general law, we juxtapose the Torrance Municipal Code (Code). As noted, the Mansel Avenue facility is in an R-2 zone, in which are conditionally permitted "Rest homes, convalescent homes, guest homes and homes for the aged. . . ." In contrast, "[h]ospitals, sanitariums and mental hospitals," "[i]nstitutions for the treatment of alcoholics, mental hygiene homes . . .," "[n]ursing homes, specialized homes for geriatrics and convalescent hospitals . . ." are permitted only in zones other than R-2. (Code, § 95.3.9.)

It is clear that section 5120 does not demonstrate a legislative intent to extend complete state preemption over local zoning control of larger facilities for the mentally disturbed. In contrast, section 5115 represents such a comprehensive preemption affecting facilities with six or fewer patients specifically expressing ". . . the policy of this state . . . that mentally and physically handicapped persons are entitled to live in normal residential surroundings and should not be excluded therefrom because of their disability." (Subd. (a).) To effect this general purpose, section 5116, referring to state authorized, certified or licensed facilities for six or less mentally disordered persons, directs that "Such homes shall be a permitted use in all residential zones, including, but not limited to, residential zones for single-family dwellings." In interpreting this section as completely preempting local regulation of such facilities in residential zones, the court in *City of Los Angeles* v. *Department of*

*Health* (1976) 63 Cal.App.3d 473, 480 [133 Cal.Rptr. 771], observed, "The consequences of placement, treatment, and, hopefully, return of the handicapped to a productive and respected place in society is a subject that transcends municipal boundaries." (See Health & Saf. Code, § 1566 et seq. specifying limitations on local regulations [added Stats. 1978, ch. 891, § 3, p. 2801].) Sections 5115, 5116, and 5120 are parts of the same regulatory scheme.

A contemporaneous commentator echoed a similar conclusion in assessing the purposes of the amendments to section 5120: "Previously, Section 5120 applied only to areas which were zoned for hospital use. By means of the conditional use permit local communities were able to allow hospitals in areas not zoned specifically for hospital use. This effectively precluded construction of mental treatment facilities since the area was not zoned for hospitals. The effect of Chapter 559 is to eliminate the conditional use permit as a means of preventing the establishment of mental treatment facilities in the local community." (*Selected 1972 California Legislation* (1973) 4 Pacific L.J. 211, 595-596.) The comment further concluded that nursing home use had been included in the amendment "apparently to make more areas available for the construction of mental treatment facilities and to prevent further circumvention of Section 5120 by local communities." (*Id.,* at p. 596.)

We find significance in the fact that the amendments to section 5120 were rendered immediately effective, indicating a sense of legislative urgency. The Legislature emphasized that "Unless health facilities which care for and treat mental patients are immediately treated on the same basis as other health facilities with respect to zoning, it will be impossible to provide for the care and treatment of mental patients in their local communities." (Stats. 1972, ch. 559, § 2, p. 961.) It seems self-evident that in declaring an urgency the Legislature intended to promote and encourage the treatment of mental patients within a community by limiting the ability of municipalities to discriminate, through zoning restrictions, against facilities serving the mentally ill. Although the legislation authorized some local regulation of facilities serving more than six residents, this authority did *not* permit the exclusion or regulation of facilities serving the mentally ill from areas which otherwise allowed treatment of the physically ill or handicapped, even if only by conditional permit.

We now examine the institutional definitions of section 5120 and City's zoning ordinance.

a.) *"Health Facilities."*

Focusing on the last sentence of section 5120, which permits "health facilities" where hospitals or nursing homes are allowed, City contends that the Mansel operation is not a "health facility" and therefore is not exempt from its zoning regulation.

City points to section 1250 of the Health and Safety Code which, for purposes of chapter 2 of division 2 of that code, defines "health facility" as "any facility, place or building which is organized, maintained, and operated for the diagnosis, care, prevention, and treatment of human illness, physical or mental, including convalescence and rehabilitation . . . for one or more persons, to which such persons are admitted for a 24-hour stay or longer . . . ." The definition includes: "General acute care hospital," "acute psychiatric hospital," "skilled nursing facility," "intermediate care facility," "small intermediate care facility/developmentally disabled habilitative," "special hospital," and "general acute care/rehabilitation hospital." City insists that the Mansel facility fits none of the foregoing institutional descriptions but, rather, is a "community care facility" defined under section 1502 of the Health and Safety Code, as opposed to a "health facility," thereby rendering section 5120 wholly inapplicable.

We are led to a contrary conclusion by examining the antecedents of section 1250. When section 5120 was enacted, the California Administrative Code recited that "health facility" included "any hospital, nursing home or intermediate care facility as defined in Sections 230, 231 and 382 and subject to licensure under the provisions of Section 1400 of the Health and Safety Code." (Former Cal. Admin. Code, tit. 17, § 229, repealed June 13, 1975 (Reg. 75, No. 24).) These sections defined the three terms "hospital," "nursing home" and "intermediate care facility." Section 1401, the predecessor of present section 1250, described a "hospital" subject to licensure under section 1400 as "any institution . . . which maintains and operates organized facilities for one or more persons for the diagnosis, care and treatment of human illness, including convalescence . . ., or which maintains and operates organized facilities for any such purpose, and to which persons may be admitted for overnight stay or longer. 'Hospital' includes sanatorium, nursing home, and maternity home." When section 1401 was repealed the foregoing "hospital" definition was transferred to the new Health and Safety Code section 1250, subdivision (b). (Stats. 1972, ch. 1148, § 3, p. 2226.) Not until 1973, when a new version of section 1250 was en-

acted, did the section include the term "health facility." (Stats. 1973, ch. 1202, § 2, p. 2564.)

It is unclear which definition of "health facility" the Legislature favored when it included the term by amendment to section 5120. At the time, there was broad language in section 1401 of Health and Safety Code and the relevant sections appearing in the Administrative Code. The latter expressly contemplated residential treatment facilities which provided less intensive medical care than that furnished in facilities which are deemed "health facilities" under the current provisions of section 1250 of the Health and Safety Code. For example, a "health facility" insofar as it was an "intermediate care facility" was defined as one which "provides supportive, restorative, and preventive health services in conjunction with a socially oriented program ..., and which ... operates 24-hour services including board, room, personal care and intermittent nursing care." (Cal. Admin. Code, tit. 17, former § 382.)

Nor do we find guidance in the extended definition of "health facility" contained in section 436.2 of the Health and Safety Code (a part of the Health Facility Construction Loan Insurance Law (Health & Saf. Code, § 436 et seq.)). This section continuously and explicitly has provided that the definitions therein contained govern the construction of the loan insurance law. They do not purport to affect provisions of the Welfare and Institutions Code.

Finally, in support of its argument that the Mansel operation is other than a "health facility" within the meaning of section 5120, City argues that section 1500 et seq. of the Health and Safety Code which established the California Community Care Facilities Act incorporates the definition of "health facility" contained in section 1250. (Stats. 1973, ch. 1203, § 4, p. 2581.) City purports to find a significant distinction between "health facilities" so defined and "community care facilities." (See Health & Saf. Code, § 1505, subd. (a).) The argument lacks persuasive force in our consideration of the meaning of "health facilities" as used in section 5120, because section 5120 was adopted before section 1505.

From all of the foregoing, we conclude that the Legislature contemplated a broad definition of "health facilities" when it enacted and subsequently amended section 5120. The facility in question may fairly be deemed a "health facility." Such an interpretation is most consistent with the legislative intent favoring local, rather than state, institutional

care of mental patients. This intent is clearly manifest in sections 5115, 5116 and 5120. As a consequence, city may only regulate the TLC facility subject to the constraints on zoning regulations imposed by section 5120.

b.) *"Nursing Homes."*

City advances, as a secondary argument, the contention that regardless of the TLC facility's status as a "health facility," services which are "nursing homes," as that term is used in section 5120, are not permitted conditionally, or otherwise, in R-2 zones under the terms of the Code. Assuming that TLC's operation is a "health facility," if "nursing homes" are not permitted by local ordinance or permit it follows, under section 5120, facilities for mental care and treatment may not be located in such zones without conditional permits or other zoning authorization. However, TLC need not establish that its facility is a "nursing home" or "hospital," only that such facilities are permitted in R-2 zones. (§ 5120.)

City argues that in enacting section 5120 the Legislature adopted the definition of "nursing home" contained in section 430.12 of the Health and Safety Code, namely, "a facility for the accommodation of convalescents or other persons who are not acutely ill and not in need of hospital care, but who require skilled nursing care and related medical services (1) which is operated in connection with a hospital, or (2) in which such nursing care and medical services are prescribed by, or are performed under the general direction of, persons licensed to practice medicine or surgery in the State." City also reasons that the "rest homes" and "convalescent homes" permitted by its Code in R-2 zones do not conform to the foregoing definition of "nursing homes."

Our review of the definitional portion of the City's Code, however, reveals that the functional distinction between these several kinds of facilities is not as clear as City suggests. When the Code definition of "convalescent homes" is sought, the reader is referred to "rest homes." (Code, at § 91.2.21.) "Rest homes," in turn, are defined as "Permitting nursing, dietary and other personal services rendered to convalescents, invalids and aged persons, but excluding cases of contagious or communicable diseases and excluding surgery or primary treatments such as are customarily conducted in sanitariums and hospitals." (*Id.*, at § 91.2.53.) A "sanitarium" means "A health station or retreat or other place where patients are kept and where medical or surgical treatment

is given, but not mental." (*Id.*, at § 91.2.55.) Finally, hospitals are categorized as general, special, extended care, and day treatment clinic. An "extended care facility" is "A facility primarily engaged in providing to in-patients the nursing care and related services for patients who require twenty-four (24) hour medical, nursing, or rehabilitation services. These facilities include the following types of institutions: [¶] (1) Convalescent or nursing homes; [¶] (2) Sanitarium." (*Id.*, at § 91.2.74, subd. (c).)

From the foregoing definitional thicket we emerge concluding: (1) section 5120 directs that "health facilities" which offer psychiatric treatment may be located in any zone where "hospitals" and "nursing homes" are conditionally or otherwise permitted by zoning; (2) the Mansel facility is a "health facility" for purposes of section 5120; (3) City's zoning Code contains overlapping definitions of "hospitals," "convalescent homes," and "rest homes"; (4) under the Code, City conditionally permits the operation of "rest homes" and "convalescent homes" in R-2 zones; and (5) because "rest homes" and "convalescent homes" are equivalent to "nursing homes" and hospitals under City's Code, section 5120 therefore preempts City's regulation of mental health facilities serving more than six persons in R-2 zones.

II. *Health and Safety Code Section 1520.5*

We are not unmindful of City's reliance on section 1520.5 of the Health and Safety Code. This section was designed to prevent the overconcentration of residential facilities in residential neighborhoods, and provides in relevant part: "(a) The Legislature hereby declares it to be the policy of the state to prevent overconcentrations of residential care facilities which impair the integrity of residential neighborhoods. Therefore, the director shall deny an application for a new residential care facility license if the director determines that the location is in such proximity to an existing residential care facility as would result in overconcentration.

"(b) As used in this section, 'overconcentration' means that if a new license is issued, there will be residential care facilities which are separated by a distance of 300 feet or less, as measured from any point upon the outside walls of the structures housing such facilities. Based on special local needs and conditions, the director may approve a separation distance of less than 300 feet with the approval of the city or county in which the proposed facility will be located."

The section is directed at facilities, not the number of patients in the facility. The establishment of a service for 15 persons does not constitute, therefore, an "over-concentration" merely because it cares for more than 6 residents.

### III. *Irreparable Harm*

■ A final consideration leads us to deny peremptory relief. We have long held that "To entitle a plaintiff to injunctive relief the burden is upon him to prove actual or threatened injury .... Facts concerning the irreparable injury which, it is asserted, will result to the complainant unless protection is extended ... must be pleaded ...." (*E. H. Renzel Co.* v. *Warehousemen's Union* (1940) 16 Cal.2d 369, 373 [106 P.2d 1]; *Wright* v. *Best* (1942) 19 Cal.2d 368, 386 [121 P.2d 702]; *7978 Corporation* v. *Pitchess* (1974) 41 Cal.App.3d 42, 46 [115 Cal.Rptr. 746] ["To qualify for preliminary injunctive relief plaintiffs must show irreparable injury, either existing or threatened"]; Code Civ. Proc., § 526, subd. 2.)

Here, City's only assertion of harm is that TLC's conduct would create a public nuisance which, presumably, City would thereafter be prevented from regulating when it discharges its governmental function "to protect the interest of its citizens and to review [TLC's] proposed home" as authorized by statute and City's Code. In considering City's claim of a potential nuisance we are presented with a barren record. It contains no affidavits regarding any alleged harm resulting to City or its residents. City's complaint was not verified. In contrast, TLC has presented affidavits demonstrating that its harm, if the injunction were to issue, would include its loss of a contract to provide services and necessary termination of the program contemplated under the contract.

Under the foregoing circumstances, no abuse of discretion by the trial court is demonstrated based on the relative potential harm to the parties.

### IV. *Preexisting Conditional Use Permit*

Because of our conclusion that the broad legislative policy expressed in section 5120 controls the disposition of the issues, we do not examine the remaining question—whether the conditional use permit which was issued in 1971 to the owners of the property and which permitted the

operation of "a board and care home for the aged" also permitted TLC to use the property for mental health facilities.

## V. *Conclusion*

The trial court did not abuse its discretion in giving section 5120 a broad interpretation consistent with the Legislature's clear and express statewide policy to encourage, when reasonably possible, care for our mentally handicapped citizens within the local community.

The order denying preliminary injunctive relief is affirmed.

Bird, C. J., Mosk, J., Newman, J., Kaus, J., Broussard, J., and Tobriner, J.,* concurred.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.