[Civ. No. 28290. Fourth Dist., Div. One. Sept. 14, 1983.]

HOWARD DeYOUNG et al., Plaintiffs and Appellants, v.
CITY OF SAN DIEGO et al., Defendants and Respondents.

**14**

---

**COUNSEL**

D. Dwight Worden and W. Scott Williams for Plaintiffs and Appellants.

John W. Witt, City Attorney, Ronald L. Johnson, Chief Deputy City Attorney, and Celeste Stahl Brady, Deputy City Attorney, for Defendants and Respondents.

---

**OPINION**

**WORK, J.**—Howard DeYoung and the Citizens for Recreational Use of Pueblo Lands (Citizens) appeal an order refusing to enjoin the City of San Diego (City), its city council and city manager, from taking further action or expending money to lease a portion of City-owed Pueblo Lands near Torrey Pines Municipal Golf Course for more than 15 years. The sole question before us is whether city charter section 219 regarding Pueblo Lands permits leasing such lands for periods in excess of 15 years upon city council approval followed by voter ratification. Concluding section 219 allows long-term leasing by such method, we affirm the order.

*Factual and Procedural Background*

The San Diego electorate adopted a new city charter in 1931, including section 219 entitled "Pueblo Lands." That section provides: "No sale of

Pueblo Lands owned by The City of San Diego which are situated North of the North line of the San Diego River shall ever be valid and binding upon said City unless such sale shall have been first authorized by an ordinance duly passed by the Council and thereafter ratified by the electors of The City of San Diego at any special or general municipal election. The City Manager shall have authority to lease Pueblo Lands, provided that any lease for a term exceeding one year shall not be valid unless first authorized by ordinance of the Council. No lease shall be valid for a period of time exceeding fifteen years." Section 219 has never been amended. An attempt to do so in 1975 resulted in the electorate rejecting, by a vote of 85,938 to 52,275, a proposal to amend section 219 to allow leasing of Pueblo Lands for periods up to 55 years, thus repealing the 15-year limitation.

During the 1950's, the City developed a portion of the Pueblo Lands in Torrey Pines Mesa as a municipal golf course and proposed constructing golf club facilities, a hotel, restaurant and related activities. In 1956, the city council enacted and the electorate ratified ordinance No. 6905 authorizing the leasing of certain portions of Pueblo lots 1330 and 1331 for a period exceeding 15 years for these purposes. In 1961, the City entered into a 50-year lease with a private party resulting in the construction of the Torrey Pines Inn. In 1963, ordinance No. 8879 (to authorize the sale or conveyance, trade or exchange of·portions of certain Pueblo lots including Nos. 1326 and 1330) was enacted by the city council, but rejected by the electorate. In 1964, ordinance No. 8983 was enacted by the city council and apparently ratified by the electorate authorizing the lease or sale of portions of certain Pueblo lots including 1326 and 1330.

Authorized by city council resolution No. R-255145, the city manager requested proposals (RFP) to develop and operate a hotel and related facilities on the Torrey Pines Mesa adjacent to the golf course. The land involved comprises portions of Pueblo lots 1326, 1330 and 1331, measuring approximately 15 acres. The proposed development contemplates the leasing of Pueblo Lands for a term greater than 15 years. After reviewing proposals by the property department, the public facilities and recreation committee and the city council, the council selected the Sheraton Corporation as the developer to exclusively negotiate with the City for potential lease and development.

DeYoung and Citizens[1] promptly sued for injunctive and declaratory relief, alleging City's actions would illegally expend public funds and waste

---

[1]Citizens is an unincorporated association of individuals formed for the purposes of protecting and preserving the rights of the public guarding the use, disposition and development of the City's Pueblo Lands.

City property because the development contemplates a lease in excess of 15 years contrary to section 219. Plaintiffs also seek to enjoin further negotiation and execution of a lease agreement for more than 15 years. Plaintiffs also seek a declaration section 219 absolutely prohibits leasing City-owned Pueblo Lands for more than 15 years and ordinance No. 6905 does not authorize the City to lease the Pueblo Lands subject to this lawsuit for more than 15 years. The trial court denied the request for preliminary injunction, stating: "In respect to the hearing held this date in which the plaintiff seeks a preliminary injunction to prohibit the City's leasing of Pueblo Lands for a term in excess of 15 years, and in which the contention of the parties centers upon the construction of Section 219 of the Charter, the Court's conclusion is the provision 'no lease shall be valid for a period of time exceeding 15 years' is to be construed according to the same standard and conditions set forth in this section applicable to the sale of Pueblo Lands and thus permits a lease of Pueblo Lands for a term in excess of 15 years if the lease is authorized by an ordinance of the Council and is thereafter ratified by the electors of the City of San Diego."

Plaintiffs contend the "plain meaning rule" when applied to the final sentence of section 219 mandates a judicial construction the City may not lease Pueblo lands for a period in excess of 15 years, even when approved by the voters. They urge the prohibitory "language of section 219, read literally and given its 'usual and ordinary import' makes plain, good sense and there is no room for judicial interpretation." Granted, when reading the last sentence of section 219 *in isolation,* it appears to clearly forbid all leases of Pueblo Lands in excess of 15 years. ■ However, sentences of a statutory provision must be read and construed in context. (*Tripp* v. *Swoap* (1976) 17 Cal.3d 671, 679 [131 Cal.Rptr. 789, 552 P.2d 749], overruled on other grounds in *Frink* v. *Prod* (1982) 31 Cal.3d 166, 180 [181 Cal.Rptr. 893, 643 P.2d 476].) Upon reading section 219 in its entirety, it becomes unclear whether it intends to forbid all leases over 15 years or just such leases not ratified by the electorate. Accordingly, we construe the charter provision in light of the character of the document it is within and relevant settled rules of statutory construction.

### APPLICABLE LAW REGARDING REVIEW AND STATUTORY CONSTRUCTION

■ The grant or denial of a preliminary injunction generally lies within the sound discretion of the trial court and will not be disturbed on appeal absent a showing of a clear abuse of discretion. (*City of Torrance* v. *Transitional Living Centers for Los Angeles, Inc.* (1982) 30 Cal.3d 516, 519 [179 Cal.Rptr. 907, 638 P.2d 1304]; *Continental Baking Co.* v. *Katz* (1968) 68 Cal.2d 512, 527 [67 Cal.Rptr. 761, 439 P.2d 889].) ■ Normally,

plaintiffs must establish that pending trial on the merits, defendants should be restrained from exercising the right claimed by them, as the underlying purpose of the injunction is to preserve the status quo until a final determination is made upon the merits. Consequently, the court must determine whether defendants would suffer greater harm from issuance of the preliminary injunction than the plaintiffs would suffer from its refusal, considering the reasonable probability the plaintiffs would ultimately prevail on the merits. (*People* v. *Pacific Land Research Co.* (1977) 20 Cal.3d 10, 21 [141 Cal.Rptr. 20, 569 P.2d 125]; *Continental Baking Co.* v. *Katz, supra,* at p. 528.) However, since the trial court based its denial of the preliminary injunction solely on its interpretation of charter section 219, we review this matter as a question of law. (*California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 699 [170 Cal.Rptr. 817, 621 P.2d 856]; *Killian* v. *City and County of San Francisco* (1978) 77 Cal.App.3d 1, 7 [143 Cal.Rptr. 430].)

■ As a chartered city, San Diego "can make and enforce all ordinances and regulations regarding the municipal affairs subject only to the restrictions and limitations imposed by the city charter, as well as conflicting provisions in the United States and California Constitutions and preemptive state law." (*Grimm* v. *City of San Diego* (1979) 94 Cal.App.3d 33, 37 [156 Cal.Rptr. 240].)

■ "The charter operates not as a grant of power, but as an instrument of limitation and restriction on the exercise of power over all municipal affairs which the city is assumed to possess; and the enumeration of powers does not constitute an exclusion or limitation. [Citations.] . . . All rules of statutory construction as applied to charter provisions [citations] are subordinate to this controlling principle. . . . A construction in favor of the exercise of the power and against the existence of any limitation or restriction thereon which is not expressly stated in the charter is clearly indicated. . . . Thus in construing the city's charter a restriction on the exercise of municipal power may not be implied." (*City of Grass Valley* v. *Walkinshaw* (1949) 34 Cal.2d 595, 598-599 [212 P.2d 894]; *Grimm* v. *City of San Diego, supra,* 94 Cal.App.3d 33, 38; see *Taylor* v. *Crane* (1979) 24 Cal.3d 442, 450-451 [155 Cal.Rptr. 695, 595 P.2d 129]; *Oneto* v. *City of Fresno* (1982) 136 Cal.App.3d 460, 464 [186 Cal.Rptr. 299].)

■ The fundamental rules of statutory construction apply to interpret charter provisions. (*Oneto* v. *City of Fresno, supra,* 136 Cal.App.3d 460, 465; *Castaneda* v. *Holcomb* (1981) 114 Cal.App.3d 939, 942 [170 Cal.Rptr. 875]; *Squire* v. *City and County of San Francisco* (1970) 12 Cal.App.3d 974, 980 [91 Cal.Rptr. 347]; *Currieri* v. *City of Roseville* (1970) 4 Cal.App.3d 997, 1001 [84 Cal.Rptr. 615].) ■ First, "the court

should ascertain the intent of the Legislature so as to effectuate the purpose of the law." (*Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672]; *California Teachers Assn.* v. *San Diego Community College Dist., supra,* 28 Cal.3d 692, 698; *Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224].) ■ Secondly, the provision must be given a reasonable and common sense interpretation consistent with the apparent purpose and intention of the lawmakers, practical rather than technical in nature, which upon application will result in wise policy rather than mischief or absurdity. (*United Business Com.* v. *City of San Diego* (1979) 91 Cal.App.3d 156, 170 [154 Cal.Rptr. 263]; *City of Costa Mesa* v. *McKenzie* (1973) 30 Cal.App.3d 763, 770 [106 Cal.Rptr. 569].) ■ Significance, if possible, should be attributed to every word, phrase, sentence and part of an act in pursuance of the legislative purpose, as "the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole." (*Moyer* v. *Workmen's Comp. Appeals Bd., supra,* 10 Cal.3d 222, 230.) ■ " 'The court should take into account matters such as context, the object in view, the evils to be remedied, the history of the times and of legislation upon the same subject, public policy, and contemporaneous construction.' " (*Cossack* v. *City of Los Angeles* (1974) 11 Cal.3d 726, 733 [114 Cal.Rptr. 460, 523 P.2d 266], quoting *Alford* v. *Pierno* (1972) 27 Cal.App.3d 682, 688 [104 Cal.Rptr. 110]; *United Business Com.* v. *City of San Diego, supra,* at p. 170.) ■ " 'Consistent administrative construction of a statute over many years, particularly when it originated with those charged with putting the statutory machinery into effect, is entitled to great weight . . . .' " (*Gay Law Students Assn.* v. *Pacific Tel. & Tel. Co.* (1979) 24 Cal.3d 458, 491 [156 Cal.Rptr. 14, 595 P.2d 592], quoting *DiGiorgio Fruit Corp.* v. *Dept. of Employment* (1961) 56 Cal.2d 54, 61-62 [13 Cal.Rptr. 663, 362 P.2d 487].) Especially where there has been acquiescence by persons having an interest in the matter (*Allen* v. *California Toll Bridge Authority* (1977) 68 Cal.App.3d 340, 363 [137 Cal.Rptr. 493]), "courts will generally not depart from such an interpretation unless it is clearly erroneous." (*Misasi* v. *Jacobsen* (1961) 55 Cal.2d 303, 308 [10 Cal.Rptr. 850, 359 P.2d 282]; *Castaneda* v. *Holcomb, supra,* 114 Cal.App.3d 939, 946; *Allen* v. *California Toll Bridge Authority, supra,* at p. 362.) ■ Accordingly, since the construction of a statute by officials charged with its administration is entitled to consideration, so are the opinions of the city attorney construing the charter provisions, like those of the Attorney General construing state constitutional and statutory law. (See, e.g., *Worthington* v. *Unemployment Ins. Appeals Bd.* (1976) 64 Cal.App.3d 384, 388-389 [134 Cal.Rptr. 507].) ■ Finally, lawmakers are presumed to be aware of long-standing administrative practice and, thus, the reenactment of a provision, or the failure to substantially modify a provision, is a strong indication the admin-

istrative practice was consistent with underlying legislative intent. (*Horn* v. *Swoap* (1974) 41 Cal.App.3d 375, 382 [116 Cal.Rptr. 113]; 58 Cal.Jur.3d, Statutes, § 111, pp. 496-497.)

### THE TRIAL COURT PROPERLY CONSTRUED SECTION 219 AS PERMITTING THE LEASING OF PUEBLO LANDS FOR A PERIOD IN EXCESS OF 15 YEARS UPON COUNCIL APPROVAL PLUS VOTER RATIFICATION

Governed by the character of a city charter as being solely an instrument of express limitation regarding power over municipal affairs and unaided by the doctrine of implication, the city charter's express restriction on the sale of Pueblo Lands cannot result in an implied restriction upon the City's power to lease such lands. Although the charter expressly restricts leasing of Pueblo Lands, it at most only prohibits the leasing of Pueblo Lands by *council action alone* for more than a certain term of years (15 after 1915), and is noticeably silent regarding the power of the City to lease upon voter ratification. A limitation of the latter cannot be implied, especially where the lands are in trust for a public constitutionally empowered by majority vote to adopt the charter, amend it, and oversee City politics. (Cal. Const., art. XI, §§ 3, 5.) The charter is a limitation upon municipal power, i.e., the governmental entity, not its electorate. An historical review of pertinent charter provisions, their construction by those responsible for their application, and the public acquiescence to that construction by electoral ratifications of specific ordinances enacted by the city council, show section 219 only limits the City's power to sell Pueblo Lands without first obtaining voter approval for periods exceeding 15 years.

The City's original charter of 1889 did not restrict the sale or lease of Pueblo Lands, but merely set forth (within § 50) a procedure to be followed in the sale or lease of any City-owned lands. It required sale or lease by public auction with three weeks published notice, permitting the lease for a term in excess of two years only upon approval by two-thirds votes of the members of each board. Section 50, subdivision (a) was amended in 1909 to require authorization by ordinance and voter ratification of any pre-1930 sale of Pueblo Lands located north of the north line of the San Diego River.[2]

---

[2]Former Charter section 50 provided: "(a) That all pueblo lands owned by the City of San Diego lying and being situated north of the north line of the San Diego River be, and the same are hereby reserved from sale until the year 1930, *provided, however,* that at any time should it be desired to sell any part or portion of such public lands prior to the year 1930, the sale thereof may be authorized by an ordinance duly passed by the common council and ratified by the electors of the city of San Diego at any special or general municipal election. The common council shall levy annually in addition to all other taxes provided for in this charter, 2c on each one hundred dollars valuation of property for the purpose of improving said pueblo lands herein reserved from sale.

"(b) The common council may provide for the sale and conveyance of or lease of all

Subdivision (b) essentially repeated the 1889 version of section 50. On August 14, 1909, the city attorney formally advised the council section 50 as amended prevented leasing Pueblo Lands north of the San Diego River without voter authorization. Although the subject matter of the opinion related to a petroleum exploration and development lease and the city attorney advised the term "sale" should be broadly construed so as to include a lease which potentially could permanently impair the value of the leased lands,[3] the city attorney held: "Moreover, subsection (b), by providing for the conveyance *or lease* of the lands *otherwise* situated in the city would seem to indicate that it was the purpose to exempt the lands lying north of the river from lease as well as from sale." In 1911, the council passed (and the electorate apparently ratified) ordinance Nos. 4404 and 4405 authorizing leasing up to 40 and 25 acres of Pueblo Lands for petroleum exploration and shale "mining" respectively.

On January 22, 1915, the city attorney issued another opinion concluding the council could lease Pueblo Lands north of the San Diego River for 25 years by ordinance if ratified by the electorate,[4] construing subdivision (a) as not a substantive, but merely a procedural, restraint upon alienation of northern Pueblo Lands, interpreting subdivision (a) together with subdivision (b), and finding the power to lease by implication from the power to sell and governed by the express procedure of authorization as to the latter.

In 1915, section 50 was renumbered section 48 and subdivision (a) was again amended to specifically authorize discretionary leasing of Pueblo Lands by ordinance, but expressly restricting the term of such a lease to no longer than 15 years.[5] Consequently, the amendment addressed solely the

---

other lands now or hereafter owned by said city not dedicated or reserved for public use; but all leases and sales shall be made at public auction, unless otherwise provided by ordinance after publication or notice thereof for at least three (3) weeks. No lease shall be made for a longer term than two years except by ordinance passed by an affirmative vote of two-thirds of the members of the common council."

[3]See also city attorney opinions regarding oil leases of Pueblo Lands dated September 30, 1937, and January 10, 1944.

[4]The opinion, however, noted that a term in excess of 10 years in the lease of municipal lands was proscribed by former Civil Code section 718.

[5]Former Charter section 48 provided in pertinent part: "48(a) That all pueblo lands owned by the City of San Diego lying and being situated north of the north line of the San Diego river be, and the same are hereby reserved from sale until the year 1930, provided, however, that at any time should it be desired to sell any part or portion of such pueblo lands prior to the year 1930, the sale thereof may be authorized by an ordinance duly passed by the Common Council and ratified by the electors to the City of San Diego at any special or general municipal election; and provided further, that if at any time it should be desired to lease any part or portion of such public lands prior to the year 1930, the leasing thereof may be authorized by an ordinance duly passed by the Common Council, provided that no lease so authorized shall be for a longer period of time other than fifteen years. The Common Council shall levy annually, in addition to all other taxes provided for in this Charter, two

authority of the council to independently lease northern Pueblo Lands and did not limit the inherent discretionary power of the municipality's electorate upon majority vote to dispose of Pueblo Lands held by the City in public trust. Thus, the 1915 amendment restricted only the authority of the council to independently lease Pueblo Lands for a term exceeding 15 years without voter ratification.

In 1931, the electorate approved a new city charter, containing the present section 219. Aside from a few substantive changes regarding the city manager's power to lease such lands for less than one year without council approval, section 219 in essence reenacts and recodifies former section 48, requiring council approval and voter ratification of sales of northern Pueblo Lands and imposing a 15-year limitation upon lease terms.

In 1956, the city council enacted, and the electorate ratified, ordinance No. 6905 authorizing leasing certain portions of Pueblo lots 1330 and 1331 for 50 years. The ensuing lease resulted in the construction of Torrey Pines Inn.

On October 24, 1963, the city attorney's office issued an opinion defining the term "sell or convey" in Proposition A (ord. No. 8879), which was later rejected by the electorate on November 5, 1963. Of pertinence here, the opinion characterized section 219 as limiting the City's powers *to deal* with the northern Pueblo Lands except for terms not exceeding 15 years. The analysis then proceeds as follows:

"It follows, then, that when the limitation as to the sale of Pueblo Lands expressed in Section 219 is no longer operative, the exception to that limitation also no longer operates. Leases for terms longer than 15 years are thus permissible, subject, of course, to the limitations contained in the California Code, which permits leases of from fifty to ninety-nine years depending on use.

"The term 'sell or convey' implies the power to lease. If the City has the power to divest itself of all interest in a piece of real property, it necessarily has the power to divest itself of some of that interest, such as by leasing it for a term of years. The larger power of sale or conveyance includes the lesser power of leasing. Furthermore, the courts of the State have held that a lease is primarily 'conveyance.'"

cents on each one hundred dollars valuation of property for the purpose of improving said pueblo lands herein reserved from sale."

Section 48, subdivision (b) was identical to former section 50, subdivision (b). Section 48, subdivision (a) was amended in 1929 by substituting "1940" for "1930."

In 1964, ordinance No. 8983 was ratified by the electorate authorizing the lease or sale of portions of certain Pueblo Lands.

The plaintiffs' reliance upon the electorate's rejection of Proposition A in 1975 is misplaced. The proposed amendment would have only replaced the 15-year limitation in section 219 with a 55-year limitation. Consequently, the amendment related only to the authority of the city council to independently lease the northern Pueblo Lands for a different prescribed period. It did not address the totally different issue of leasing Pueblo Lands for a period in excess of 15 years upon voter approval. As the published argument in favor of Proposition A pointed out, the amendment had no effect upon the provision regarding voter approval.

We believe the City's and the trial court's construction of section 219 so as to permit the leasing of Pueblo Lands in excess of 15 years upon voter approval constitutes a reasonable and practical construction consistent with historical application and the underlying power of the electorate. Plaintiffs' strained interpretation would permit the electorate to authorize such a lease by charter amendment by majority vote, but not under the challenged procedure which likewise only requires a majority vote. Finally, we find it unreasonable to believe the electorate provided for the sale of Pueblo Lands with voter approval but prohibited long-term leases approved by the same voters.[6]

*Disposition*:

Order affirmed.

Staniforth, Acting P. J., and Joseph, J.,* concurred.

---

[6]We are unpersuaded by plaintiffs' argument it is reasonable to treat sales differently than leases of Pueblo Lands because sales unshackle the City of landlord liability, subject the realty to taxation, and raise cash equal to the full present fair market value which in turn can be invested or immediately expended for public purposes, while long-term leases produce no tax revenue and subject the City to landlord liability. Fair market value of realty is predicated upon its anticipated future value or revenue-producing potential. Clearly, an incorrect estimate of future value of realty would pecuniarily injure the City similarly to a financially improvident lease. Moreover, the amount of tax revenue which would be lost by leasing should be more than compensated by the value of retaining title to the land. Finally, the City's standard lease contains provisions for regular rent adjustments to reflect increased land value (flat-rate lease) or increased income by the tenant (percentage lease). Consequently, be it by lease or by sale, the City can through prudent evaluation and negotiation protect the interests of its residents.

*Assigned by the Chairperson of the Judicial Council.