[No. C028478. Third Dist. Mar. 26, 1999.]

WILLIAM SCHMITT et al., Plaintiffs and Respondents, v.
TRI COUNTIES BANK, Defendant and Appellant.

**COUNSEL**

John P. Dunlap; Bruce L. Belton; David R. Mazzi; Bothel & Long and Peter Brian Bothel for Defendant and Appellant.

Carr, Kennedy, Peterson & Frost, Robert M. Harding; Bandell & Swanson and Leonard Bandell for Plaintiffs and Respondents.

**OPINION**

**CALLAHAN, J.**—Northstate Asphalt, Inc. (Northstate), a corporation owned by William and James Schmitt (the Schmitts), installed site improvements at the Sylvan Trails subdivision in Shasta County. Northstate was not paid for the work. It sued defendant Tri Counties Bank (TCB), successor in interest to the construction lender, as well as the developer and others, for breach of contract and to foreclose on a mechanic's lien. TCB appeals from the judgment entered in favor of the Schmitts, as assignees of Northstate, following a court trial.[1]

TCB raises three questions on appeal: (1) Did Northstate's mechanic's lien as site improver take priority over TCB's prior recorded deed of trust under Civil Code section 3137? (2) If Northstate's mechanic's lien did *not* have priority over TCB's deed of trust, are the Schmitts entitled to an

---

[1]After commencement of legal action, the Schmitts sold the stock of Northstate, but retained this claim as a receivable.

equitable lien requiring TCB to transfer title to two lots in Sylvan Trails? (3) Was TCB entitled to credit against the judgment for the $50,000 settlement paid by the developer to the Schmitts for attorney fees? We conclude the trial court correctly decided the first and third questions. For this reason, we need not address the question whether the Schmitts were entitled to enforce an equitable lien.

### FACTUAL AND PROCEDURAL BACKGROUND

The developer entered into a construction loan agreement with Country National Bank (CNB), TCB's predecessor in interest, in June 1994.[2] The loan was secured by a construction deed of trust recorded on June 9, 1994.

Robert Coghill was the bank officer in charge of the $550,000 loan both before and after CNB merged with TCB. Coghill was unaware of Civil Code section 3137, a separate priority statute for site improvement liens, during administration of the construction loan.[3] Nor did Coghill know payment bonds were a means to ensure priority of TCB's deed of trust. TCB disbursed $228,108.68 directly to the developer.

In July 1995, the developer contracted with Northstate for site improvements, including grading and paving of roadways. At that stage, the only way the developer could pay for the necessary road construction was to "barter out." The Schmitts, aware of the developer's precarious financial condition, agreed to accept as payment for site improvements the remaining construction loan proceeds of $26,000, approximately $28,000 in Federal Emergency Management Agency (FEMA) and Small Business Administration loan funds, $54,000 in proceeds from the sale of lot No. 11, and title to lot No. 18. TCB approved the deal, and agreed to release its interest in lot Nos. 11 and 18 with no paydown.

At the time the site improvement contract was signed, it was estimated that no more than $10,000 to $20,000 of work had to be completed outside the contract before the developers could record the subdivision map. It was also understood that TCB would release lot Nos. 11 and 18 when the subdivision map was recorded. On July 13, 1995, the Schmitts received TCB's agreement to release lot Nos. 11 and 18. Northstate began work on site improvements the next day.

The developer did not receive all the funds it expected under the FEMA loan, and was unable to pay Northstate the amount due under the site

---

[2] The construction loan agreement defined the borrower/developer as Aubec & Associates, Inc. (AAI), Robert B. Richardson, and Julie H. Richardson. Aubec Equipment Company, Inc. (AECI), was formed by the developers for the Sylvan Trails project. From a practical standpoint, AECI and AAI were one in the same.

[3] All undesignated statutory references are to the Civil Code.

improvement contract. The Schmitts recorded Northstate's notice and claim of mechanic's lien on November 29, 1995. The developers eventually lost the property, and TCB recorded its trustee's deed upon sale the following August.

Northstate filed legal action in February 1996. The developer settled with Northstate five months before trial. Pursuant to the terms of the stipulation for judgment, the $50,000 settlement was credited to attorney fees incurred in the enforcement of this action.

The court trial proceeded on two theories of liability: the priority of the mechanic's lien over TCB's deed of trust; and, if the court rejected that theory, enforcement of an equitable lien against lot Nos. 11 and 18. The court awarded the Schmitts judgment of foreclosure of their mechanic's lien in the amount of $167,452.38. Alternatively, it ruled the Schmitts were entitled to enforce their equitable lien against lot Nos. 11 and 18.

DISCUSSION

I

*Priority of the Mechanic's Lien*

Generally, deeds of trust recorded before commencement of any work of improvement have priority over mechanics' liens. (Marsh & Marsh, Cal. Mechanics' Lien Law (5th ed. 1995) § 4.153, p. 4-140.) Among the statutory exceptions to this rule is the special preference given site improvement liens under Civil Code section 3137, which reads: "The liens provided for in Section 3112 with respect to site improvements are, subject to the exception in Section 3139, preferred to . . . (c) any mortgage, deed of trust, or other encumbrance recorded before the commencement of the site improvement work which was given for the sole or primary purpose of financing such site improvements, unless the loan proceeds are, in good faith, placed in the control of the lender under a binding agreement with the borrower to the effect that such proceeds are to be applied to the payment of claims of claimants and that no portion of such proceeds will be paid to the borrower in the absence of satisfactory evidence that all such claims have been paid or that the time for recording claims of liens has expired and no such claims have been recorded."

Section 3139 states: "If the owner of the land or holder of any mortgage or deed of trust, which is subordinate pursuant to Section 3137 to any lien, shall procure a payment bond in an amount not less than 50 percent of the

principal amount of such mortgage or deed of trust and shall record such payment bond in the office of the county recorder in the county where the site is located before completion of the work of improvement, then such mortgage or deed of trust shall be preferred to all such liens provided in Section 3112."

The trial revealed the parties' fundamental disagreement on the interpretation of section 3137. The dispute appears to have focused on the meaning of the phrase "to the effect" found in section 3137, subdivision (c). TCB argued section 3137 required only that it prove TCB held construction loan proceeds in good faith under a binding agreement with the borrower. On appeal, TCB says that agreement had to include words "to the effect" that proceeds are to be applied to pay claimants and that none of the proceeds will be paid to the borrower until all claims are paid or the time for recording liens has expired.

The Schmitts said that once they proved the loan involved site improvements, the statute required proof TCB acted in good faith to implement the Legislature's intent to protect those claiming site improvement liens. In other words, the Schmitts read the portion of the statute beginning with "to the effect" as *with the result* "that such proceeds are to be applied to the payment of claims of claimants and that no portion of such proceeds will be paid to the borrower in the absence of satisfactory evidence that all such claims have been paid or that the time for recording claims of liens has expired and no such claims have been recorded." (§ 3137, subd. (c).)

In granting priority to Northstate's mechanic's lien, the court found that: (1) there was no binding agreement under section 3137 because the language of the construction loan agreement did not comply with the statute; and (2) in any event, TCB did not make a good faith effort to comply with its statutory duty to secure satisfactory evidence that all mechanic's lien claims had been paid before it disbursed $228,108.68 to the developer. The court observed: "This was a subdivision project which was mismanaged by both the developer, in not staying within its budget, and by the bank in dis[bur]sing funds without monitoring loan disbursements to insure that the project would be completed within the budget."

On appeal TCB contends it is entitled to reversal because: (1) the language of the construction loan agreement satisfies the requirements of section 3137; (2) section 3137 requires only that a lender hold funds in good faith, and there is no sanction for failing to properly implement a qualifying agreement; and (3) there is insufficient evidence to support the trial court's finding TCB failed to make disbursements under the construction loan

agreement in "good faith."[4] We consider and reject each of TCB's contentions.

### A. *Statutory Construction:*

■ Our analysis begins with a brief review of the rules of statutory construction. The objective of the process is to ascertain and effectuate legislative intent. To determine intent, courts look first to the language of the statute, giving effect to its plain meaning. (*Kimmel* v. *Goland* (1990) 51 Cal.3d 202, 208-209 [271 Cal.Rptr. 191, 793 P.2d 524].) In addition, the statutory provision must be given "a reasonable and common sense interpretation consistent with the apparent purpose and intention of the lawmakers, practical rather than technical in nature, which upon application will result in wise policy rather than mischief or absurdity. . . . Significance, if possible, should be attributed to every word, phrase, sentence and part of an act in pursuance of the legislative purpose, as 'the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole.' " (*DeYoung* v. *City of San Diego* (1983) 147 Cal.App.3d 11, 18 [194 Cal.Rptr. 722], citations omitted, disapproved on other grounds in *Yamaha Corp. of America* v. *State Bd. of Equalization* (1998) 19 Cal.4th 1, 15 [78 Cal.Rptr.2d 1, 960 P.2d 1031].)

■ Turning to the mechanic's lien statute at issue here, we note that any doubt about its meaning should be resolved in favor of the lien claimant. (*E. D. McGillicuddy Constr. Co.* v. *Knoll Recreation Assn., Inc.* (1973) 31 Cal.App.3d 891, 897 [107 Cal.Rptr. 899].) "The mechanics' lien is the only creditors' remedy stemming from constitutional command and our courts 'have uniformly classified the mechanics' lien laws as remedial legislation, to be liberally construed for the protection of laborers and materialmen.' . . ." (*Coast Central Credit Union* v. *Superior Court* (1989) 209 Cal.App.3d 703, 708 [257 Cal.Rptr. 468], citation omitted.) As the California Supreme Court concluded in *Connolly Development, Inc.* v. *Superior Court* (1976) 17 Cal.3d 803, 827-828 [132 Cal.Rptr. 477, 553 P.2d 637], ". . . the laborer and materialman have an interest in the specific property subject to the lien since their work and materials have enhanced the value of that property; and . . . state policy strongly supports the preservation of laws which give the laborer and materialman security for their claims. In

---

[4]TCB also argues for the first time on appeal that Northstate was not within the class of lien claimants section 3137 was designed to protect. At trial TCB argued the statute applied, but the Schmitts were interpreting it incorrectly. "A party is not permitted to change [its] position and adopt a new and different theory on appeal. To permit [it] to do so would not only be unfair to the trial court, but manifestly unjust to the opposing litigant." (*Ernst* v. *Searle* (1933) 218 Cal. 233, 240-241 [22 P.2d 715].)

measuring these values, we do not deal in cold abstractions: we take into account the social effect of the liens and the interests of the workers and materialmen that the liens are designed to protect. We measure these valued interests against the loss, if any, caused to the owner. The balance tips in favor of the worker and the materialman; . . ."

## B. *The Language of the Construction Loan Agreement:*

█ As we stated, the trial court ruled TCB failed to prove it had a binding construction loan agreement for site improvements within the meaning of section 3137. TCB maintains that although it was unaware of section 3137 at the time it had the developers execute the form construction loan agreement, "the only inference that can be drawn from [the agreement's] numerous provisions for control of loan proceeds is that it satisfies the requirements of Section 3137." We disagree with TCB's assessment.

Central to TCB's argument at trial was notice—that it had only to set forth in a binding agreement what was required of the borrower under section 3137. "It doesn't describe what happens if there's a breach of the loan agreement." Moreover, under TCB's theory, to constitute a binding agreement under the statute, the form need only contain language *to the effect* of section 3137, subdivision (c). Although we agree with TCB that a loan agreement need not quote section 3137 verbatim, we conclude critical elements were missing from the construction loan agreement at issue here. Accordingly, the trial court properly found the construction loan agreement did not comply with section 3137.

Under its express language, section 3137 applies only to site improvement liens. However, TCB's form construction loan agreement contained no reference to site improvements in its lengthy definition section. The opening paragraph referenced "improvements" which the agreement later defined as "all existing and future buildings, structures, facilities, fixtures, additions, and similar construction on the Property."[5] Also absent is any reference to the section 3139 payment bond.[6] These omissions undermine TCB's argument the agreement satisfies the requirements of section 3137.

---

[5]At trial, the parties stipulated that Sylvan Trails was a site improvement project.

[6]The construction loan agreement gave the borrower notice that the lender could request a performance and payment bond in a sum equal to 100 percent of the amount of the construction contract, as well as a materialmen's and mechanics' payment bond to be "duly recorded or filed *in accordance with California Civil Code Section 3235,* . . ." (Italics added.)

The construction loan agreement required the borrower to supply lien waivers as a condition precedent to each advance of loan funds.[7] However, it did not include the language from section 3137, subdivision (c)—either verbatim or paraphrased—that "no portion of such proceeds will be paid to the borrower in the absence of satisfactory evidence that all such [lien] claims have been paid *or that the time for recording claims of liens has expired and no such claims have been recorded.*" (Italics added.)

There is no question TCB and the developer executed a construction loan agreement, and they agreed the proceeds were to be used for site improvements at Sylvan Trails. However, absent knowledge of section 3137 and reference to the substance of its key provisions, TCB has not shown it had a binding agreement within the meaning of the statute.

## C. *TCB's Obligations Under Section 3137:*

██ We also conclude the trial court properly found that in order to preserve its priority under section 3137, TCB was required to do more than secure a binding agreement which referenced the borrower's obligations and hold the loan funds in good faith. As argued by the Schmitts, the lender is required to control the loan proceeds until all the liens are paid. In reaching this conclusion, we rely primarily on the language of section 3137, subdivision (c).

As we explained, the statute states that mechanics' liens for site improvements have priority over "any mortgage, deed of trust, or other encumbrance recorded before the commencement of the site improvement work which was given for the sole or primary purpose of financing such site improvements, unless the loan proceeds are, in good faith, placed in the control of the lender under a binding agreement with the borrower *to the effect* that such proceeds are to be applied to the payment of claims of claimants and that no portion of such proceeds will be paid to the borrower in the absence of satisfactory evidence that all such claims have been paid or that the time for recording claims of liens has expired and no such claims have been recorded." (§ 3137, subd. (c), italics added.)

---

[7]Page three of the construction loan agreement contained the following language: "CONDITIONS PRECEDENT TO EACH ADVANCE. Lender's obligation to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement. [¶] . . . [¶] Lien Waivers. Borrower shall have obtained and attached to each application for an Advance, including the Advance to cover final payment to the General Contractor, executed acknowledgments of payments of all sums due and releases of mechanic's and materialmen's liens, satisfactory to Lender, from any party having lien rights, which acknowledgments of payment and releases of liens shall cover all work, labor, equipment, materials done, supplied, performed, or furnished prior to such application for an Advance."

Common dictionary definitions support the Schmitts' reading of "to the effect" as "with the result." The American Heritage Dictionary (2d college ed. 1991) defines the noun "effect" as "[s]omething brought about by a cause or agent; result. . . ." (P. 439; see also Webster's New Internat. Dict. (3d ed. 1971) p. 724, col. 2; and 3 Oxford English Dict. (1933) p. 47.)

Moreover, considering the language of section 3137, subdivision (c) in its entirety, it is clear the phrase "to the effect" refers to the antecedent "proceeds" not "binding agreement." In other words, a mechanic's lien for site improvements has priority "unless the *loan proceeds* are, in good faith, placed in the control of the lender . . . *to the effect that such proceeds* are to be applied to the payment of claims of claimants and that *no portion of such proceeds* will be paid to the borrower in the absence of satisfactory evidence that all such claims have been paid or that the time for recording claims of liens has expired and no such claims have been recorded." (§ 3137, subd. (c), italics added.)

Our reading of section 3137, subdivision (c) is consistent with the state policy supporting the preservation of laws which give the laborer and materialman security for their claims. (*Connolly Development, Inc.* v. *Superior Court, supra,* 17 Cal.3d at pp. 827-828.)

TCB notes that "[t]he statute sets forth the mandatory terms of the agreement in the future tense—proceeds *'are to be applied,'* and none of the proceeds *'will be paid'* to the borrower." (Italics in original.) It argues "[b]oth of these steps are established at the outset so that the lender is assured of *its* priority." Thus, TCB questions how, under the court's construction, a lender can know "whether it has, in fact, been subordinated pursuant to section 3137, and thus procure a bond. . . ." TCB also insists "[t]here is nothing in Section 3137 which addresses any sanction for a lender failing to properly implement a qualifying agreement."

Addressing the last question first, we believe the Legislature intended loss of priority to be the sanction for a lender's failure to comply with section 3137. Indeed, fear of that loss provides an incentive for the lender to ask the borrower to provide a bond *or* maintain close control of disbursement of loan proceeds. Either action on the part of the lender serves the legislative purpose to protect site improvement lien claimants.

In deciding whether a lender has exercised good faith in the administration of loan proceeds under section 3137, it is not enough that there are no outstanding claims of lien at the time the lender makes its disbursement. The statute expressly states that "no portion of such proceeds will be paid to the

borrower in the absence of satisfactory evidence that all such claims have been paid *or that the time for recording claims of liens has expired and no such claims have been recorded.*" (§ 3137, subd. (c), italics added.) Lenders understand that mechanics' liens are more likely to arise at the end rather than the beginning of a construction project or phase of site improvement.

We also reject TCB's suggestion that our reading of section 3137 imposes an unfair burden on lenders by requiring them to determine at the outset whether to secure a bond for site improvements. TCB complained at trial that such an interpretation would price owner/builders out of the loan market because they could not afford the bond a lender would require. Lenders routinely assess the need to require payment and performance bonds in the course of processing construction loans. If a lender accepts the risk of loaning funds for an undercapitalized or financially questionable project without requiring a bond, the lender, not the site improver, must bear any loss that results. Where, as here, the lender ultimately forecloses on the deed of trust securing the construction loan, it retains the value of the site improvements installed by the lien claimant.

### D. *Sufficiency of the Evidence:*

██ TCB challenges the sufficiency of the evidence to support the court's finding "the loan proceeds were not, in good faith, placed in the control of Country National Bank and/or defendant TRI COUNTIES BANK to the effect that such proceeds were to be applied to the payment of all claims of claimants and that no such portion of such proceeds were to be paid to the borrower in the absence of satisfactory evidence that all such claims had been paid."

██ "[I]n examining the sufficiency of the evidence to support a questioned finding, an appellate court must accept as true all evidence tending to establish the correctness of the finding as made, taking into account, as well, all inferences which might reasonably have been thought by the trial court to lead to the same conclusion. Every substantial conflict in the testimony is, under the rule which has always prevailed in this court, to be resolved in favor of the finding." (*Bancroft-Whitney Co.* v. *McHugh* (1913) 166 Cal. 140, 142 [134 P. 1157].) ██ We conclude there is ample evidence in the record to support the trial court's finding here.

On pay request No. 1, all the money listed as the first line item went to the borrower/developer. A large part of the funds earmarked "mobilization" was used by the developer to repay the loan it obtained for the down payment to acquire Sylvan Trails. The developer told Coghill that part of the funds

designated for engineering would be used to repay the down payment loan. Coghill acknowledged he knew there was "some sort of arrangement." When asked if it mattered to him, Coghill responded, "Not—not terribly. [¶] . . . [¶] [I]t seemed minor in comparison to the whole thing. And . . . it didn't seem that degree of concern."

Once loan disbursements commenced, Coghill did not refer to the construction loan agreement to determine when, where, and how he could disburse funds under the loan. He made only a cursory review of the documents when they were initially prepared.

Coghill inspected the project every two or three weeks during the summer and fall of 1994. Sometime in that period, "it became apparent that they were—they had expenses or there was much more expense—they had overshot their budget, just to make it easy." However, Coghill approved every disbursement request, at least in part. Some of the requests were not backed up by documentation.

TCB did not question its burden to prove good faith once the Schmitts established Sylvan Trails involved a site improvement project. In spite of this, TCB failed to introduce any evidence to show the $228,108.68 in loan proceeds paid directly to the developer was used to pay "claims of claimants." The court, acting as finder of fact, was entitled to infer no such evidence existed.

## II

### Attorney Fees

In the stipulation for judgment filed after settlement between Northstate and the developers, the parties agreed that: (1) the court would enter judgment against the developers; (2) Northstate would not execute on the judgment; and (3) the developer would tender $50,000 to be applied to "attorney's fees incurred in the enforcement of this action." The stipulation expressly stated: "No amount of the $50,000.00 settlement proceeds shall be credited against principal, interest or court costs."

The judgment and decree for foreclosure against TCB and the developers following trial acknowledged that the developers owed the Schmitts $207,979.13 plus interest, attorney fees, and costs of suit at the time the stipulation for judgment was filed. The judgment continued: "(2) The STIPU-LATION confirmed that plaintiffs were to recover their reasonable attorney's fees and that the settlement tender of fifty thousand dollars ($50,000.00),

made by the defendants referenced in the STIPULATION, was to be credited to plaintiffs' attorney's fees, with no portion being credited against principal, interest or costs, and no portion of this STIPULATION is to be credited to this Judgment.

"(3) The attorney's fees incurred by SCHMITT exceeded the fifty thousand dollars (50,000.00), therefore there is no excess for application against principal, interest or costs."

■ TCB argues the court should credit the $50,000 settlement against the $167,452.38 judgment, notwithstanding the settling parties' agreement to allocate the proceeds to attorney fees. It bases this claim on Code of Civil Procedure sections 877 and 877.6, which deal with good faith settlements and contribution among joint *tortfeasors*. TCB cites no authority to support application of these tort principles to the contract and lien claims involved in the case before us.

Northstate's first amended complaint joined TCB, the developer, and others in the first cause of action to foreclose on its mechanics' lien. The second cause of action for breach of contract involved only the developer. The site improvement contract between Northstate and the developer provided for the recovery of attorney fees by the prevailing party in any civil action to enforce the agreement. Thus, Northstate sought recovery of contract damages, interest, attorney fees, and litigation costs from the developers. TCB was not a party to that contract, and Northstate did not allege it was a co-obligor for its breach.

Attorney fees are not included in the amount of a lien, and cannot be recovered in a lien foreclosure action. (§ 3123; *Abbett Electric Corp.* v. *California Fed. Savings & Loan Assn.* (1991) 230 Cal.App.3d 355, 358, 360 [281 Cal.Rptr. 362].) In these circumstances, the settlement allowed the Schmitts to recover from the developers an element of the contract damages not available from defendants in the remaining lien foreclosure claim. There is no claim by TCB that the settlement involving attorney fees gave the Schmitts a windfall or double recovery.

In any event, we believe TCB waived its right to raise the issue of offset by stipulating to the amount of the Schmitts' claim at the start of trial with knowledge of the terms of the earlier settlement with the developers.[8]

---

[8]TCB's stipulation began with the $207,979.13 acknowledged as due and owing by the developers in the stipulation for judgment. To reach the figure of $167,452.38, TCB added interest, and subtracted a $75,000 credit unrelated to the developer's settlement.

## DISPOSITION

The judgment is affirmed.

Blease, Acting P. J., and Davis, J., concurred.